**UNITED STATES of America,**
**Appellee,**

v.

**Nicholas RATTENNI, Appellant.**

**No. 780, Docket 73–1062.**

United States Court of Appeals,
Second Circuit.

Argued April 18, 1973.

Decided June 7, 1973.

Roy M. Cohn, New York City (Saxe,
Bacon, Bolan & Manley, New York City,
Michael Rosen, on the brief), for appel-
lant.

Edward M. Shaw, Sp. Atty., Dept. of
Justice (Whitney North Seymour, Jr.,
U. S. Atty., S. D. N. Y., John W. Nields,
Asst. U. S. Atty., on the brief), for ap-
pellee.

Before CLARK, Associate Justice,*
and WATERMAN and FEINBERG,
Circuit Judges.

Mr. Justice CLARK:

Appellant Nicholas Rattenni, along
with his co-defendants Boggia, Fiore and
Roman, was charged under § 1503 of Ti-
tle 18 with conspiracy to corruptly influ-
ence, impede and intimidate petit jurors
in the discharge of their duties in a pre-
vious felony trial of Rattenni; a second
count charged them with the substantive
offense of obstruction of justice, i. e.,
corruptly endeavoring to influence a
member of the jury, William Freeman,
in the same case in violation of § 1503
and § 371, Title 18; and a third count
charged Fiore alone with perjury in the
presentation of this case to the grand
jury. The indictment was dismissed as
to Boggia on the opening day of the
trial. Three days later the case went to
the jury in the afternoon and about 9:30
p. m. a verdict was returned against
Rattenni on the conspiracy charge. The
jury announced that it was deadlocked
as to all other defendants and charges.
On the following morning before delib-
eration was resumed, the forelady of the
jury advised the trial judge that she had
heard a radio broadcast [1] that morning
which made reference to Rattenni's
prior conviction but stated that she was
not influenced by it. The trial judge de-
cided to interrogate the other jurors
about the broadcast; he conducted the
inquiry himself in an anteroom, allowing
counsel to make suggestions. It was
learned that six of the jurors had heard
the broadcast. One juror, Mrs. Metz,
stated that she had not only heard the
broadcast but had also read a story
about Rattenni in the New York Daily
News on the previous day prior to the
verdict on the conspiracy count.[2] She
readily admitted her prejudice against
Rattenni on the remaining open charges
against him as well as on all of the
charges against his co-defendants. The
trial judge then ordered a mistrial on
the open charges against Rattenni and
all of the charges against all of the re-
maining defendants. He refused, how-
ever, to set aside the verdict previously

* Associate Justice of the United States
Supreme Court (Retired), sitting by
designation.
1. Mrs. Metz, a juror, recalled the broad-
caster as saying that Rattenni had been
indicted previously "on several counts and
this is his fifth trial within a year or
two."
2. "Rattenni Case to Jury
Six witnesses were summoned by the
defense yesterday to contest prosecution
testimony that attempts were made to
'reach' a juror in the trial of West-
chester 'garbage king' Nicholas Rattenni
on tax fraud charges last January.
Rattenni and two other men are on trial
in Manhattan Federal Court on the jury
tampering charges.
Judge Milton Pollack recessed the
trial after the testimony. The jury is
to begin deliberations at 9:30 a. m.
today.
Yesterday's witnesses addressed them-
selves to testimony given Monday in
which a nephew of a juror in the trial
that took place in January said that
Joseph Fiore, 32, of Stony Point, had
offered him money to speak to his uncle.
Rattenni was acquitted in that trial,
but was convicted later in a gambling
protection scheme involving state
troopers."

returned against Rattenni on the conspiracy charge. Later Rattenni was sentenced to five years in prison to run consecutively with a three-year sentence previously imposed upon him in another prosecution then on appeal. We have concluded that this was error and reverse.

Our reversal hinges on the disclosures of Mrs. Metz to the trial judge when he was examining the jurors about the radio broadcast. She told him that she had read the Daily News story before the verdict of guilty was returned against Rattenni on the conspiracy count. Although she did identify the article by the tag "garbage king" that the News placed on Rattenni, she initially recalled that it stated: "And he [Rattenni] was also held on charges—something to do with garbage collection." As to the broadcast she readily confessed that she "felt that all the indictments against that gentleman [Rattenni] could have an effect on my voting." And she repeated: "Well, that many indictments is a little bit heavy on the load . . . to feel that you are so free and easy with your thinking." It is true that when asked if "from here on" she felt that she would be able to be impartial, she said: "Well, it would affect me." The Government seems to say that by this forthright answer—as contrasted to her recollection only of the "garbage king" language of the Daily News story —Mrs. Metz disclaimed prejudice resulting from the newspaper article and by implication stated that she had been fair and impartial in her vote the night before against Rattenni on the conspiracy charge. However, the trial judge never asked her explicitly whether she had been prejudiced by the Daily News story. He had conducted the interrogation of Mrs. Metz and the questions asked were insufficient to ferret out her real mental attitude after reading the story; the judge simply asked her to identify the article she had read. However, its impact is indicated by Mrs. Metz's ex-

planation that she "had no way of knowing what he [Rattenni] was involved in before" the publicity came out "but now that all this has happened in the past" she could not be fair or impartial. Indeed, the prejudice was so set that she admitted that she could not be fair to his co-defendants because of Rattenni's "direct association with these people involved, completely in association with one another." Indeed the trial judge found: "This lady gives a sincere impression that she has been influenced by this mischievous conduct on the part of the press and the media. . . ."

Nor can we, as the Government requests, permit the judgment to stand because of the alleged dereliction of Rattenni's counsel. He stated without contradiction that he did not know about any of the publicity until the forelady and the jurors revealed it. However, he had been told afterwards in the courtroom corridor that "for the last two days" the Westchester media had "been talking about Mr. Rattenni's prior convictions and indictments. . . ." Counsel's concern over the effect of the Daily News article was characterized as "a little late." The trial judge found: "We duly recorded a proper verdict last night and the jury was polled. There was no taint whatsoever on the verdict and I am not going to have any proceeding now in a backhanded way designated to impeach that verdict in this manner. This is not the way to do it."

We believe that this record unquestionably shows that there was a taint upon the verdict returned against Rattenni on the conspiracy charge. With six jurors having heard the publicity, the jury could not continue to deliberate impartially even though only one juror admitted prejudice. Since that same juror had expressly identified as prejudicial those aspects of the radio broadcast relating to prior indictments against appellant, and since the newspaper article which she read shortly before rendering the verdict on count one also

referred to conviction on a prior indictment, it was necessary under the circumstances to set aside the verdict rendered on the previous evening. This conclusion is buttressed not only by the admissions of Mrs. Metz but by the action of the court declaring a mistrial on the remaining charges. From our reading of the transcript, we are unable to agree with the Government that "Mrs. Metz's testimony was clear that the Daily News article had not prejudiced her." [3] On the contrary, she was never asked if the article biased her and made no such disclaimer *sua sponte*. In view of the questions asked and the answers she did make, and the material that came to her attention, the compelling inference is precisely the opposite. Moreover, no disclaimer by Mrs. Metz of prejudice on the previous day can be implied simply by her failure expressly to admit bias since this likely resulted from the failure to put the question to her and the normal juror's disinclination to impeach his rendered verdict especially where his impartiality has not been squarely challenged. See Sheppard v. Maxwell, 384 U.S. 333, 351–352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Any difference between *Marshall* and the present case on the basis of the number of jurors prejudiced is insignificant. The verdict must be set aside where even one juror in effect admits prejudice; after all, a defendant is entitled to twelve fair and impartial jurors. In requiring the retrial of this count (count one), we do not close our eyes to the weighty evidence presented against appellant which makes us reluctant to reverse. Nonetheless, the crucial importance of protecting the integrity of the trial process from such intrusions as occurred in this case mandates that we not permit the conviction to stand. We are further fortified in our decision by the knowledge that this disposition will not impose an undue burden on the Government if appellant is retried on count one along with the new trial on the counts which resulted in a mistrial.

Rattenni claims other errors in the trial, some of which were peculiar to it and are not likely to recur. However, some of the assigned errors might arise at the second trial and we will dispose of them.

■ 1. Wiretap evidence was introduced which was obtained by an interception authorized under New York Criminal Procedure Law § 700.65(4), McKinney's Consol.Laws c. 11–A, and made available to the Government. The state law permits the interception of conversations not covered in the original court authorization but requires that an amendment of that order must be sought by the appropriate party "as soon as practical." § 700.65(4). Rattenni claims that the amendment here was not sought as soon as practical. The tap was begun on November 26, 1971, reviewed on December 26, reviewed again on January 26, 1972, and was disconnected on February 5, 1972. Amendment was not obtained until June 1, 1972. The indictment here was also returned June 1, 1972. The obvious purpose of the amendment requirement of New York law is to compel judicial approval as well as to permit supervision of evidence-gathering relating to crimes not included in the original authorization. The conversations in question were intercepted on January 12, 13, 14 and 20. Daily logs of these conversations were received by the County Attorney on January 26 but no immediate action was taken because of difficulty in interpreting the relevant conversations. The January 21 and 25 logs were received on February 5, 1972, the date the tap was discontinued. For this reason no amendment of the original order was sought at that time. In mid-February

3. Brief of the United States of America, at 16.

the United States Attorney's office was contacted and told that a possible violation of federal law appeared to be involved. Since the taps had been abandoned there was no necessity to seek a prompt amendment of the original order. The June 1 amendment was purely *pro forma*. We cannot say that in these circumstances there was any violation of § 700.65(4).

■ Appellant also claims that the state court order authorizing the wiretap in question was invalid because, while it is dated November 24, 1971, the application of the District Attorney is dated November 26. The discrepancy in dates indicates a sloppiness in procedure that we cannot condone. It appears in this case, however, that no wiretap was actually undertaken until November 26, by which time the court had an opportunity to examine the signed application. Moreover, the supporting affidavit of State Police Investigator Vernon Smith is dated November 24, and by itself establishes probable cause for the wiretap.

2. Appellant complains of the refusal of the court to admit the testimony of Christine Seymour, a defense witness, concerning statements made to her by Rattenni shortly after his acquittal on the underlying charge. The Government now admits this evidence might have been offered to explain Rattenni's intercepted statements to Boggia. On retrial this should be borne in mind.

3. Finally, two inadvertent errors crept into the trial. The Government had stipulated that (1) references in the indictment to the underlying charge (bribery) were to be excised; and (2) references in the intercepted conversations indicating a prior Rattenni conviction was on "appeal" were to be stricken when read to the jury. The jury was, however, exposed to these references. These mistakes should be avoided on retrial.

Reversed and remanded.