COMMONWEALTH vs. JOHN W. FIDLER.

Middlesex.    April 19, 1977. — February 1, 1978.

Present: KEVILLE, ARMSTRONG, & BROWN, JJ.

*Identification. Evidence*, Cross-examination, Relating to deliberation
by jurors. *Practice, Criminal*, Instructions to jury, Deliberation of
jury, New trial. *Jury and Jurors.*

At a criminal trial there was no error in the admission of an identifica-
tion of the defendant made shortly after a robbery when police
officers brought a witness to a barber shop in the basement of a
building into which the robber had fled and, upon being told by the
witness that a man with lather on his face might be the robber,
wiped the lather from the man's face and brought him to the wit-
ness at the door of the barber shop. [31]

At a robbery trial, permitting the prosecutor during cross-examina-
tion of a witness to bring out that the witness, who gave an alibi for
the defendant, had provided similar alibi testimony to a defendant
in an unrelated criminal case was not reversible error where the
judge later reversed his ruling and instructed the jury to disregard
the improper questioning. [31–32]

A remark by a judge at a criminal trial which might have conveyed
to the jury a suggestion that the defendant could resolve certain
factual questions if he were to testify was made harmless by the
judge's forceful instruction to the jury to strike such a thought
wholly from their minds. [32]

At the hearing of a motion for a new trial based on an affidavit by a
juror concerning irregularities in the jury's deliberations by which
the defendant sought to impeach the verdict, the judge properly
declined to receive the affidavit in so far as it related to the jury's
disregard of instructions by the judge in considering certain mat-
ters. [32–35]

At a hearing on a motion for a new trial based on an affidavit by a
juror by which the defendant sought to impeach the verdict, the
judge erred in ruling the affidavit incompetent when it was offered
to show that the jury discussed and considered facts concerning the
defendant which had not been adduced through the court room
proceedings and which were prejudicial to him. [35–38]

Standards for determining whether a jury verdict must be set aside because of irregularities in the jury's deliberations. [38–40]

INDICTMENT found and returned in the Superior Court on February 12, 1974.

The case was tried before *Keating, J.*, and a motion for a new trial was heard by him.

*James W. Lawson* for the defendant.

*Sheila Ryan,* Legal Assistant to the District Attorney, for the Commonwealth.

ARMSTRONG, J. The defendant was found guilty of robbing, while armed and masked, a bank located in Cambridge in a complex of buildings known as Technology Square. The robbery occurred shortly after ten o'clock in the morning on October 17, 1973. Three masked men entered the bank, one holding a machine gun and another a revolver. The latter, who wore a tan trench coat, skin-colored gloves, and a blue ski face mask, and was described by witnesses as being 5 feet, 10 inches, or 6 feet and very husky, vaulted over the counter and emptied the tellers' cash drawers of approximately $29,000. The robbers were unsuccessful in opening the vault. They left the bank about five minutes after they had entered; but, before they left, a passer-by outside saw the robbery in progress through large plate glass windows and notified a Registry of Motor Vehicles inspector parked nearby. The inspector radioed for help and, when the robbers emerged from the bank, pursued them on foot, warning them to stop, and firing an occasional shot over their heads. Perhaps for that reason, one of the robbers, the one in the trench coat, split off from the other two. The Registry inspector pursued the two to a parking lot within the complex of buildings, where they entered a car and escaped. The man in the trench coat, observed by several persons who had been alerted by the shots, walked quickly towards another building in the complex, shedding his revolver, blue ski mask and gloves in the courtyard between the buildings. He entered the second building,

vacillated in deciding where to go, and finally passed through a doorway to a staircase that led to the basement.

The fact was reported by several of the observers to the Registry inspector and to Cambridge police who were arriving on the scene. Some of the police officers searched the basement. There was a barber shop with several persons in it; otherwise no persons were found in the basement. There was an unlocked exit from the basement, permitting an inference that the third robber, the one in the trench coat, had either escaped through that exit or was in the barber shop. The police returned to the barber shop with a man named Dow, an employee of Polaroid Corporation who had been taking photographs in the courtyard and had seen the robber's face at close range as he entered the building. Dow said that one of the men in barber's chairs could be the robber, but he couldn't be certain because the man was having a shave and his face was covered with lather. The police then wiped the lather from the man's face and brought him to the door of the barber shop where Dow identified the defendant with no hesitation or uncertainty. A trench coat was found a few minutes later rolled up and pushed under the staircase.

A lineup was subsequently held at Cambridge police headquarters. Dow repeated his identification; two other persons who had seen the robber passing through the courtyard failed to identify the man from the barber shop, although one, who identified a different person at the lineup, later said that she had made a mistake and that the man Dow identified was the one. No fingerprints were found on the revolver, nor could hair samples taken from the man in the barber shop be linked positively to ones found on the trench coat and ski mask. It is thus apparent that the linchpin of the Commonwealth's case was Dow's identification, with some corroboration, perhaps, in the neatness with which the trench coat was concealed, suggesting the action of one who intended to stay in the basement, rather than a more careless dis-

carding which might be expected of one hurrying towards the exit.

The man thus identified was the defendant Fidler, a 32 year-old married man who lived with his wife and two children in Charlestown and was then a student at a local community college. He had no wallet or identification with him when he was arrested but did have $101 in cash.

Little need be said about the exceptions taken by Fidler during his trial. Two are now argued. One concerns a ruling by which the judge admitted in evidence Dow's identification of the defendant in the barber shop. This the defendant characterizes as an unnecessarily suggestive, one-on-one, custodial identification, ignoring the judge's finding, based on adequate evidence, that the defendant was not in custody at the time. Apart from the fact that an unnecessarily suggestive, out-of-court identification may be admissible if it is marked (as the judge found this identification to be) by various indicia of reliability, *Manson* v. *Brathwaite*, 432 U.S. 98, 104-106 (1977), it is also clear that the prompt showup in this case was an entirely proper procedure. *Commonwealth* v. *Barnett*, 371 Mass. 87. 91–92 (1976), cert. denied, 429 U.S. 1049 (1977). The second argued exception relates to the testimony of a defense witness, one O'Leary, who gave an alibi for the defendant. On cross-examination, over objection, the prosecution was permitted to bring out that O'Leary had provided similar alibi testimony to a defendant in an otherwise unrelated criminal prosecution. This line of questioning should not have been permitted, for "[i]n Massachusetts the rule has been that a witness cannot be asked on cross-examination, in order to affect his credibility, about his part in transactions irrelevant to the issue on trial." *Commonwealth* v. *Schaffner*, 146 Mass. 512, 515 (1888). *Commonwealth* v. *Binkiewicz*, 342 Mass. 740, 755 (1961). Leach & Liacos, Massachusetts Evidence 123 (4th ed. 1967). But, in the end, the judge reversed his ruling, struck the improper line of questioning from the testimony, and instructed the jury in no uncertain terms to disre-

gard it. Such an instruction is normally regarded as sufficient to offset any prejudice that may have been generated. *Commonwealth* v. *Crehan,* 345 Mass. 609, 613 (1963), and cases cited. *Commonwealth* v. *Eagan,* 357 Mass. 585, 589 (1970). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 536-537, 539 (1971). Whether a different result need be reached where the jury are shown to have ignored the judge's instructions (contrast *Commonwealth* v. *Bellino,* 320 Mass. 635, 645, cert. denied, 330 U.S. 832 [1947]) is a separate matter to be considered below, in connection with the defendant's motion for a new trial.

We mentioned a third exception taken during the trial, which is not now separately argued, but which also has a bearing on the new trial motion. During a colloquy with counsel, the judge made a remark which might have conveyed to the jury a suggestion that the defendant could resolve certain factual questions if he were to testify. The judge caught the improper import of his remark in mid-sentence, and thereafter instructed the jury forcefully to strike such a thought wholly from their minds. The instruction was of a type which has been repeatedly held adequate to render the improper suggestion harmless beyond a reasonable doubt. *Lussier* v. *Gunter,* 552 F.2d 385, 389 (1st Cir. 1977).

The trial began on Wednesday, January 22, 1975, and lasted five days. The jury retired to consider the case at 1:25 P.M. on Tuesday, January 28. At 9:08 P.M. the jury informed the judge that they were not close to reaching a verdict, and the judge read the modified *Tuey* charge (see *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 97-101 [1973]). At 10:20 P.M. the jury were put up for the night, and they resumed deliberations the next morning. At 3:00 that afternoon, the foreman of the jury, in response to questioning by the judge, stated that he thought they could reach a verdict if they continued a little longer, and at 4:25 P.M. they returned and announced a verdict of guilty. The following morning the defendant was sentenced to M.C.I. Walpole for a term of from ten to twenty years.

On March 13, 1975, the defendant filed a motion for a new trial. It was based on an affidavit by one of the jurors, a woman named Russell. The affidavit recited that she had telephoned counsel for the defendant on February 1, 1975, to report various irregularities by other jurors during their deliberations.[1] Three such alleged irregularities were set out in the affidavit: (1) The jury disobeyed the judge's instruction to disregard his inadvertent remark suggesting that the defendant could clear certain matters up by testifying. (2) The jury disobeyed the judge's instructions to disregard the evidence that the alibi witness O'Leary had offered similar alibi testimony for another defendant who had been convicted of some offense in a Federal court. (3) One of the jurors, a woman named Ross, had stated during the deliberations: "People who run around with guns like that ought to be afraid. Maybe someone might shoot at them, someday." Another juror, a woman named Crawford, "then spoke up and in an animated voice said, '(to the effect) They did shoot at him last month and almost got him in Charlestown.' Then there was sort of a silence or a lull on the part of the rest of the jurors. I [i.e., the juror Russell] broke the silence with a remark (to the effect) that 'I thought we weren't supposed to know anything about this case ahead of time.' She got a trapped look on her face and in an angry and defensive fashion, she denied knowing anything about the case in advance."

A hearing was had on the motion for a new trial, which the juror Russell attended, apparently prepared to testify. The judge denied the motion, ruling that Russell's affidavit and testimony were incompetent, applying an oft-cited rule, deriving from Lord Mansfield's decision in *Vaise* v. *Delaval*, 99 Eng. Rep. 944 (K.B. 1785), that testimony by a juror may not be received to impeach the verdict affirmed in open court by the jury.

---

[1] She had previously contacted an assistant district attorney, a State police detective, and a lawyer for the American Civil Liberties Union. It was the latter who advised her to contact the defendant's counsel.

The rule in question was originally an application of a once (but no longer) recognized principle that a witness is incompetent to testify to his own wrongdoing. 8 Wigmore, Evidence § 2352 (McNaughton rev. 1961). The survival of the rule in its application to jury verdicts has been due to widespread apprehension that the jury system could not function effectively if jurors could be examined to determine whether they had adhered to the judge's instructions.[2] This Commonwealth's leading case on the subject, followed by the United States Supreme Court in *Mattox* v. *United States*, 146 U.S. 140 (1892), is *Woodward* v. *Leavitt*, 107 Mass. 453 (1871), which reversed an order denying a motion for a new trial because the judge had considered the testimony of a juror, in support of the verdict, relative to their deliberations within the jury room and the votes they had taken. A distinction was drawn: that the jurors might testify to

---

[2] See, e.g., the statements of Lamar, J., in *MacDonald* v. *Pless*, 238 U.S. 264, 267–268 (1915) ("[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation —to the destruction of all frankness and freedom of discussion and conference") and by L. Hand, J., in *Jorgensen* v. *York Ice Mach. Corp.*, 160 F.2d 432, 435 (2d Cir.), cert. denied, 332 U.S. 764 (1947) ("[I]t would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unravelling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it").

their acts or statements outside the jury room and to the
infiltration into the jury room of papers not in evidence
or other extraneous influences, but they should not be
permitted to testify to the parts which they took, or the
statements they made, or the motives which influenced
them, in their private deliberations. *Id.* at 466, 467, 471.
Compare *Johnson* v. *Witt,* 138 Mass. 79, 80 (1884). The
rule of *Woodward* v. *Leavitt* remains the applicable law in
this Commonwealth, *Commonwealth* v. *Harrison,* 2 Mass.
App. Ct. 775, 780–781, *S.C.* 368 Mass. 366, 374–376 (1975),
and squarely bars impeachment of the jury's verdict on
a showing that they misunderstood the judge's instruc-
tions, or erroneously recalled the evidence, or discussed
in their private deliberations matters which the judge
struck from the evidence and ordered them not to consid-
er.[3] Thus, the judge properly declined to receive the af-
fidavit as evidence bearing on the first two grounds set
out for impeaching the jury's verdict.

The remaining material set out in the affidavit: name-
ly, the statements by two jurors of facts about the defend-
ant not received in evidence, would likewise be barred by
the rule of *Woodward* v. *Leavitt* as matter spoken by
jurors in the course of their private deliberations. *Com-*

---

[3] It makes little difference whether the rule is cast in terms of
competency ("jurors may not be heard to impeach their verdict"),
reflecting its origin as a rule of evidence, or is cast as a rule of substan-
tive law: that the jury's shortcomings of the type in question furnish
no ground for overturning their verdict. The evidentiary formulation
has been criticized: "[Certain] decisions . . . suggest it as not improba-
ble that when the question arises in the future, the testimony of the
jurors may be held competent, and that we shall no longer hear that
they may not 'impeach their verdict,' when it is 'impeachable' if what
they say is true. Maybe not; judges again and again repeat the conse-
crated rubric which has so confused the subject; it offers an easy
escape from embarrassing choices. In the case at bar, at any rate, we
shall not dispose of the appeal in that way; we shall accept what the
affidavits said, as did the judge, and like him we shall decide whether
it requires the relief asked." L. Hand, J., in *Jorgensen* v. *York Ice
Mach. Corp.,* 160 F.2d at 435. In Massachusetts the rule was held to
be one of substantive law, rather than a rule of evidence only, as early
as *Commonwealth* v. *Meserve,* 156 Mass. 61, 62 (1892).

monwealth v. *Meserve*, 156 Mass. 61, 62 (1892) (a case indistinguishable in principle from this one). In this application, however, there is some question whether the rule has not been superseded.

The question arises from a case decided in 1966 by the United States Supreme Court, *Parker* v. *Gladden*, 385 U.S. 363. It involved a bailiff who told members of the jury in a State court criminal proceeding that the defendant was a "wicked fellow" and was guilty and that they should not hesitate to convict him because, if there were anything wrong with their so doing, it would be corrected by an appellate court. On a showing of these facts, the State courts refused to overturn the conviction. The Supreme Court reversed, holding that the jury's exposure to facts not introduced in evidence violated the defendant's Sixth Amendment rights of confrontation and cross-examination.

*Parker* v. *Gladden* need not have been read to disturb traditional limitations on impeachment of jury verdicts. On similar facts most States would have required the jury's verdict to be set aside. See *Woodward* v. *Leavitt*, 107 Mass. at 466, and cases cited in *People* v. *DeLucia*, 20 N.Y.2d 275, 282–283 (1967) (dissenting opinion of Van Voorhis, J.) and in 8 Wigmore, Evidence § 2354, at 716 n.13 (McNaughton rev. 1961). The rule of *Woodward* v. *Leavitt* would not bar a showing of the bailiff's statements, even by testimony of jurors, because those statements were not a part of the jury's deliberations, but an intrusion of an extraneous influence on their deliberations (107 Mass. at 466). Recent decisions, however, have not recognized such a distinction as one confining the rule of *Parker* v. *Gladden*. In particular, on the authority of that case, all (so far as we are aware) Federal Circuit Courts of Appeal that have considered the question have concluded that a defendant in a criminal case will be entitled to a new trial when it is shown that the jury considered specific facts concerning the defendant which were prejudicial to the defendant and were not adduced

through the courtroom proceedings. *United States ex rel. Owen* v. *McMann*, 435 F.2d 813, 817–820 (2d Cir. 1970), cert. denied, 402 U.S. 906 (1971).[4] *Government of Virgin Islands* v. *Gereau*, 523 F.2d 140, 149-150 (3d Cir. 1975), cert. denied, 424 U.S. 917 (1976). *Downey* v. *Peyton*, 451 F.2d 236 239 (4th Cir. 1971). *United States* v. *Howard*, 506 F.2d 865, 866-867 (5th Cir. 1975). *United States* v. *Eagle*, 539 F.2d 1166, 1170 (8th Cir. 1976) (new trial not ordered because juror who realized during the trial that he knew extra-record facts about the defendant did not divulge those facts to the other jurors). *Gafford* v. *Warden, United States Penitentiary, Leavenworth*, 434 F.2d 318, 320-321 (10th Cir. 1970). See also *Rees* v. *Peyton*, 341 F.2d 859, 865 (4th Cir. 1965), cert. denied, 386 U.S. 989 (1967), and *United States* v. *Love*, 535 F.2d 1152, 1156 (9th Cir. 1976). Compare *People* v. *DeLucia*, 20 N.Y.2d 275 (1967), reversing *People* v. *DeLucia*, 15 N.Y.2d 294 (1965). While we are reluctant to adopt a rule which will encourage posttrial inquiry into jury deliberations and will have some tendency to "add . . . to the already fragile state of criminal convictions" (*United States ex rel. Owen* v. *McMann, supra* at 817), it would be inconsonant with the trend of recent case law not to acknowledge this additional protection for defendants in criminal cases. We hold, therefore, that the judge erred in ruling incompetent the affidavit of the juror Russell when offered to show that the jury discussed and considered extra-record facts concerning the defendant which were substantially prejudicial to him. The conviction will be sustained, but there must be a new hearing on the defendant's motion for a new trial.

The issues at the rehearing will be (1) whether extra-record facts about the defendant, not alluded to in the proceedings in court, were in fact told to jurors, and, if so

---

[4] In the *Owen* case Friendly, J., treated the extra-record facts about the defendant which a juror knew and divulged during jury deliberations as an extraneous influence within the analysis of *Woodward* v. *Leavitt*. Contrast *Commonwealth* v. *Meserve*, 156 Mass. 61, 62 (1892).

(2) whether their exposure to such facts operated to the prejudice of the defendant.

The jury's verdict is presumed to be valid, *United States* v. *Robbins*, 500 F.2d 650, 653 (5th Cir. 1974), and the person challenging it has the burden of proving acts of jury misconduct sufficient to set it aside. *United States* v. *Eagle*, 539 F.2d at 1169-1170. That burden is not sustained by a showing merely that the jurors have been exposed (outside the court room) to facts of a generalized, neutral nature about the parties or the case. *Government of Virgin Islands* v. *Gereau*, 523 F.2d at 151.[5] It is necessary that the jurors should have been exposed to objective, extrinsic facts about the defendant, or to unused evidence in the case, and that the extra-record facts be such as tend to the prejudice of the defendant who seeks to have the verdict set aside. *United States ex rel. Owen* v. *McMann*, 435 F.2d at 818. *United States* v. *Howard*, 506 F.2d at 867.

In determining whether the jury's exposure to extra-record facts has been prejudicial to the defendant, the judge is not to attempt to ascertain how exposure to those facts operated on the minds of the jurors, but rather is to consider the tendency of that exposure in all the circum-

---

[5] "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin* v. *Dowd*, 366 U.S. 717, 722 (1961). "One, although by no means the only purpose of the insistence on trial in the vicinage both in Article III, § 2, and in the Sixth Amendment, must have been to entitle a defendant to trial where he is known—and this may sometimes work against him rather than in his favor." *United States ex rel. Owen* v. *McMann*, 435 F.2d at 817.

stances and its probable effect on a hypothetical average jury. See ABA Standards, Trial by Jury § 5.7 (Approved Draft 1968), cited in *Commonwealth* v. *Harrison,* 368 Mass. 366, 375 (1975). See also *Whitney* v. *Whitman,* 5 Mass. 405 (1809); *Hix* v. *Drury,* 5 Pick. 296, 302 (1827); *Woodward* v. *Leavitt,* 107 Mass. at 462 & 466-467; *Harrington* v. *Worcester, Leicester & Spencer St. Ry.,* 157 Mass. 579, 583 (1893). To the same effect, see *United States ex rel. Owen* v. *McMann,* 435 F.2d at 820; *United States* v. *Howard,* 506 F.2d at 869. The judge may, however, take into account whether the extrinsic facts to which the jury has been exposed are strongly or only marginally prejudicial, *United States ex rel. Owen* v. *McMann,* 435 F.2d at 818, their degree of specificity or generality (*ibid.*) the tendentiousness of the circumstances surrounding their communication to the jury (*Government of Virgin Islands* v. *Gereau,* 523 F.2d at 152), their pertinence to the crimes for which the defendant is being tried (*Farese* v. *United States,* 428 F.2d 178, 181-182 [5th Cir. 1970]), and the potential significance of their impact given the strength or weakness of the evidence properly admitted against the defendant (*United States* v. *McKinney,* 434 F.2d 831, 832-833 [5th Cir. 1970], cert. denied, 401 U.S. 922 [1971]; *Commonwealth* v. *DeChristoforo,* 360 Mass. at 539).

The test is analogous to that applied in cases where a jury have been exposed to prejudicial newspaper accounts of objective extrinsic facts concerning the defendant, as to which see *United States* v. *Thomas,* 463 F.2d 1061 (7th Cir. 1972); *United States* v. *Rattenni,* 480 F.2d 195 (2d Cir. 1973); *United States* v. *Concepcion Cueto,* 515 F.2d 160, 163-164 (1st Cir. 1975); *Commonwealth* v. *Crehan,* 345 Mass. 609 (1963). Contrast *Commonwealth* v. *Stanley,* 363 Mass. 102, 104-105 (1973) (newspaper article about the trial which added little to what the jury already knew through testimony); *Commonwealth* v. *Bartoloni,* 2 Mass. App. Ct. 152, 154–158 (1974) (newspaper article which did not contain facts prejudicial to the defendant).

The situations are parallel, for it would seem a matter of slight consequence to the defendant whether the jury as a group learn of extraneous, prejudicial facts through the words of other jurors or through direct exposure to news media. *United States ex rel. Owen* v. *McMann,* 435 F.2d at 820.

On the other hand, where, as may be found to be the case here, the prejudicial effect is not overwhelming, we think that the judge may appropriately take into consideration whether the defendant has, in effect, acquiesced in, or accepted the risk of, some possible prejudice by waiving opportunities to have prospective jurors inquired of to determine whether they know the defendant, or know of him, or have read or heard anything about him or the crime for which he is to be tried. See G. L. c. 234, § 28, as amended through St. 1975, c. 335. It should often be anticipated that one or more of the jurors will have some knowledge of the defendant or of the case (see note 5, *supra*), and the defendant who makes little or no effort to ascertain the state of the jurors' knowledge in this respect makes a tactical choice by which he may later be bound. *Commonwealth* v. *Grace,* 370 Mass. 746,754 (1976). *United States* v. *McKinney,* 429 F.2d 1019, 1027 (5th Cir. 1970). A failure in this respect is, of course, of no relevance if the juror who communicates extraneous facts to the other jurors has learned of them after empanelment —a matter of which the record before us is silent but which may come to light in the course of rehearing the motion for a new trial.

The judgment is affirmed. The order denying the defendant's motion for a new trial is reversed, and the case is remanded for a rehearing of that motion in accordance with the principles set out in this opinion.

*So ordered.*