**UNITED STATES of America**

**v.**

Anthony Frank GAGGI, a/k/a "Nino"; Joseph Carmine Testa, Jr., a/k/a "Joey"; Patrick Testa, a/k/a "Patty"; Henry Borelli; Peter La Froscia; Anthony Michael Senter; Ronald Ustica, a/k/a "Ronnie"; Judith May Hellman; Wayne Hellman; Sol Hellman; Paul Dordal, a/k/a "Paulie Pinto"; Richard Mastrangelo, a/k/a "Richie"; Ronald Turekian, a/k/a "Bulldog"; Herman Weisberger, a/k/a "Hymie"; Edward John Rendini, a/k/a "Fast Eddie"; Joseph Guglielmo, a/k/a "Old Man Joe"; Douglas Rega; Pedro Luis Rodriguez, a/k/a "Pedro Paz"; Gus Kalevas; Salvatore Mangialino; Carlo Profeta, a/k/a "Carlos" and "Carmello"; Dennis Testa and Abdullah Mohammad Hassan Hussain, a/k/a "The Arab", Defendants.

No. SSS 84 Cr. 0063 (KTD).

United States District Court, S.D. New York.

March 10, 1986.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City (Walter S. Mack, Jr., Mary Lee Warren, Michael Kellogg, Asst. U.S. Attys., of counsel), for the U.S.A.

Michael Rosen, New York City, for defendant Anthony Gaggi.

Lipsitz, Green, Fahringer, Roll, Shuller & James, New York City (Herald Price Fahringer, of counsel), for defendant Joseph Testa.

Robert L. Ellis, New York City, for defendant Henry Borelli.

Joel Winograd, New York City, for defendant Peter LaFroscia.

Benjamin Brafman, New York City, for defendant Anthony Senter.

Hochheiser & Aronson, New York City (Lawrence Hochheiser, of counsel), for defendant Ronald Ustica.

Slotnick & Cutler, New York City (John Jacobs, of counsel), for defendant Richard Mastrangelo.

David S. Greenfield, New York City, for defendant Ronald Turekian.

Zerin & Cooper, New York City (Jay M. Zerin, of counsel), for defendant Edward Rendini.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

On December 16, 1985, at approximately 5:30 p.m., Paul Castellano and Thomas Bilotti were shot and killed by three assailants while exiting a car in front of Sparks Steak House on 46th Street between Second and Third Avenues. A tremendous amount of publicity immediately followed concerning this incident. Since September 30, 1985, Castellano and nine others had been on trial before me on charges that, *inter alia*, they were all members of a car theft conspiracy. As a result of the enormous publicity generated by Castellano's death, the attorneys for the remaining defendants moved for a mistrial. On January 8, 1986, that motion was denied.[1] I shall now set forth my reasons for that denial as well as the subsequent denials of numerous mistrial motions made after January 8, 1986.[2]

On December 17, 1985, the day after Castellano was killed, I conducted a separate voir dire of each juror. They were asked a number of questions regarding what, if anything, they had heard or seen about Castellano's death and whether they believed they could still be fair and impartial as to the remaining defendants. All of the jurors knew of Castellano's death and basically how it came about. Approximate-

---

1. Desiring to avoid any further publicity in this case, I withheld publication of this opinion until after the completion of the trial.

2. Although the publicity regarding this case decreased substantially after the January 8, 1986,

decision was announced, when there were newspaper articles or radio reports that defense counsel perceived as potentially prejudicial to their clients mistrial motions and requests for an individual voir dire of the jurors were made.

ly six of the jurors also had heard something to the effect that Castellano had been the head of organized crime. Without exception, however, none of the jurors had heard anything about the remaining nine defendants or about the trial, other than the fact that Castellano had been a defendant in it. The jurors all stated that they would still be able to decide the case fairly and impartially and that what they had learned about Castellano would in no way affect their ability to judge the other defendants.

Following the voir dire, I requested defense counsel to gather together the transcripts of the T.V. and radio broadcasts that some of the jurors had indicated they had seen or heard. Defense counsel informed me that it would take at least a few days to get this material to me. Accordingly, as it had always been my intention to suspend the trial over Christmas and New Year's weeks, I adjourned all proceedings until January 6, 1986 at which time I heard arguments on the mistrial motion. In the interim, there were numerous newspaper articles and T.V. and radio reports regarding Castellano's murder. This publicity included details about the killings and speculation about Castellano's background and the cause and possible ramifications of his death. The publicity surrounding Castella-

no's death did not abate for quite a few days, in part due to the fact that certain law enforcement personnel considered it appropriate to be highly visible and conduct numerous interviews wherein they discussed their various theories for Castellano's death, and also because the media reported that the Archdiocese of New York denied a Mass of Christian Burial for Castellano.

At oral argument on January 6, 1986, defense counsel highlighted the following areas of publicity which they considered to be the most prejudicial: (1) references to Castellano's position as the alleged leader of the Mafia; (2) references to the fact that the defendants in the instant case are to be tried on many other charges in later trials;[3] (3) discussions regarding the costs of organized crime to the community; (4) coverage of the fact that the Catholic Church, through Cardinal John J. O'Connor, assertedly denied a Mass of Christian Burial for Castellano;[4] (5) allusions to other defendants on trial;[5] (6) references to electronic surveillance in Castellano's home; and (7) suggestions that Castellano may have been killed because it was feared that he was about to become an informant or that he was going to be found guilty in this trial. As I stated at the January 6, 1986 hearing,

---

**3.** The indictment in this case originally charged 24 defendants with 78 counts including eleven separate substantive conspiracy counts. In addition to the automobile related offenses which were the subject of this first trial, there are narcotics, extortion, prostitution, firearms, civil rights, and RICO offenses charged in the indictment. Because I did not consider it possible for me to give all of the defendants a fair trial with such an indictment, I divided the case into a number of areas with the first trial involving the automobile related charges. Trials on the remaining charges will now follow.

**4.** The initial reports in the media carried the story as set out in the text above. However, in Cardinal O'Connor's column in *Catholic New York*, there appeared the following:

> *Question:* Why did you refuse to permit Mr. Castellano to be buried in a Catholic cemetery?
> *Answer:* I did not refuse burial in a Catholic cemetery. The family of Mr. Castellano asked that he be buried in Moravian Cemetery

on Staten Island. That's where he was buried. I authorized and requested that a Catholic priest be present at the graveside with the family, to say the prayers and to bless the grave. Hundreds of Catholics are buried in Moravian Cemetery by choice.

> *Question:* Why did you forbid a Mass for Mr. Castellano?
> *Answer:* I did not forbid a Mass. I forbade only the presence of the body. I asked Bishop Ahern, my Episcopal Vicar for Staten Island, to offer Mass with the family present, in his own church on Staten Island, following the funeral. Thus what could have been a public spectacle was avoided, and in my judgment, a considerable amount of scandal was also avoided.

O'Connor, *The Castellano Case*, Catholic New York, Jan. 2, 1986, at 5.

**5.** Anthony Gaggi was mentioned as an alleged "capo" or "captain" and the "only defendant of alleged rank" remaining in the trial. It was also noted that Richard Mastrangelo, Peter LaFroscia, and Edward Rendini are incarcerated.

this publicity was clearly harmful. However, that there has been prejudicial publicity regarding an ongoing criminal trial is not the determinative factor when considering whether to declare a mistrial. Rather, it is only the first element of a multi-step procedure that a district judge must follow when deciding a mistrial motion.

In *United States v. Lord,* 565 F.2d 831, 838 (2d Cir.1977), the Second Circuit set forth "[t]he guidelines to be followed by a district court confronted with the problem of publication or broadcast of information concerning an ongoing criminal trial ...." The procedure is as follows:

> First, the court must decide whether the publicity contains potentially prejudicial information, and whether the members of the jury might have been exposed to it. If the broadcast or article contains no information beyond the evidence in the case, or if the information is clearly innocuous or the possibility of the jury's exposure to it is remote, further inquiry may not be necessary. If however, the court determines that the article or broadcast has a potential for unfair prejudice, then an initial inquiry of the jury is necessary to ascertain whether any of its members have been exposed to the information. Any juror who responds that he or she has been so exposed should be examined individually, out of the presence of the other jurors, to determine the extent of the exposure and its effect on the juror's attitude toward the trial.

*United States v. Lord,* 565 F.2d at 838–39 (footnote omitted). The court went on to explain that "[t]his precautionary procedure should permit the court to determine what further steps, if any, are required to insure that the trial proceeds fairly." *Id.* at 839.

Given my conclusion that the publicity disseminated throughout the community over the three week period following Castellano's murder had "a potential for unfair prejudice," it was incumbent upon me to conduct another voir dire of the jurors. Because of the pervasive nature of the publicity, I decided to proceed under the assumption that the jurors would be unable to avoid the publicity at least to some extent. Thus, I chose to start immediately with a separate voir dire of each juror "to determine the extent of the exposure and its effect on the juror's attitude toward the trial."

█ The voir dire of the individual jurors lasted the entire day on January 7, 1986. I found the jurors to be sincere and candid in their responses to detailed questions regarding what they had seen or heard since Castellano's death and what their present impressions were as to the remaining defendants. The jurors exhibited a conscientious desire to avoid the publicity regarding this case and an insightful understanding of the irrelevance of any publicity that they were exposed to. Not one juror heard or saw anything that gave him or her the impression that the remaining nine defendants were involved in organized crime. In fact, no one heard or saw anything at all about the remaining nine defendants or the trial. Although many of the jurors stated that they did hear something about the Cardinal denying Castellano a public mass, interestingly most volunteered that they disagreed with the Cardinal's action and all affirmed that it would have absolutely no effect on their ability to give the remaining defendants a fair trial. Many of the jurors indicated that they remembered one or more of the theories being suggested for why Castellano was murdered. However, without exception, all of the jurors were unequivocal in their belief that their judgment had not been affected by Castellano's death and the ensuing publicity and that they remained fair and impartial and could decide this case solely on the evidence presented at trial.

Defendants relied heavily on *United States v. Rattenni,* 480 F.2d 195 (2d Cir. 1973), in support of their mistrial motion. However, that case is easily distinguishable from the present one. In *Rattenni,* after the jury reached a guilty verdict against Nicholas Rattenni on the conspiracy count of the indictment, but before they reached

a verdict regarding any of the remaining defendants and charges, certain members of the jury heard a radio broadcast that referred to Rattenni's prior conviction. During a voir dire conducted by the trial judge in which the jurors were asked about the radio broadcast, one juror, Mrs. Metz, "readily admitted her prejudice against Rattenni on the remaining open charges against him as well as on all of the charges against his codefendants." *Rattenni,* 480 F.2d at 196. Mrs. Metz also informed the judge that, prior to the guilty verdict against Rattenni on the conspiracy charge, she had read an article in the New York Daily News about Rattenni. This article also referred to Rattenni's conviction on a prior indictment. "[T]he trial judge never asked [Mrs. Metz] explicitly whether she had been prejudiced by the Daily News story," *Rattenni,* 480 F.2d at 197, but rather simply declared a mistrial as to all of the open charges and refused to set aside the guilty verdict as to Rattenni on the conspiracy count. The Second Circuit held that a retrial of the conspiracy count was necessary essentially because Mrs. Metz "was never asked if the article biased her and made no such disclaimer *sua sponte"* and, in fact, the logical inference was that she had been prejudiced before the verdict against Rattenni had been rendered. *Rattenni,* 480 F.2d at 198. Thus, unlike the instant case where a complete and detailed voir dire was conducted [6] and each juror stated positively that he or she had not been prejudiced and could remain fair and unbiased, *Rattenni* involved a situation where a juror admitted she would be prejudiced in all future deliberations and, though not explicitly questioned on the subject, where, in all likelihood, she had been prejudiced in her prior deliberations.

Similarly, the other cases cited by defendants are also unpersuasive. Generally, these cases involved either acts of juror misconduct, *see United States v. Delaney,* 732 F.2d 639, 641 (8th Cir.1984); *United*

*States v. Hillard,* 701 F.2d 1052, 1063 (2d Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983), or juror exposure to publicity "that was probative of guilt and highly prejudicial," *United States v. Williams,* 568 F.2d 464, 470–71 (5th Cir. 1978); *see also Marshall v. United States,* 360 U.S. 310, 311–12, 79 S.Ct. 1171, 1172–73, 3 L.Ed.2d 1250 (1959). In the present case there was no juror misconduct and the publicity the jurors were exposed to was collateral in nature.

Although the publicity which surrounded this trial is unfortunate and the cause of the surge in publicity in mid-December tragic, a mistrial is not the appropriate solution as long as the jurors can remain fair. The Supreme Court has stated:

due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). I denied defendants' mistrial motion on January 8, 1986 because I found the jurors in this case to be sincere in their proclamations that their impartiality had been unaffected by the publicity and because I adhered to the Supreme Court's observation that "[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up

---

**6.** The voir dire consisted of questions suggested by defense counsel as well as my own questions, some of which were modeled after those asked by Judge Dooling in *United States v. Persico.*

See *United States v. Persico,* 425 F.2d 1375, 1380–81 n. 8 (2d Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970).

to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950), *quoted in Smith v. Phillips*, 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7.

■ After the January 8, 1986 denial of defense counsel's mistrial motion, the publicity regarding this case was minimal through to the time the jury began deliberations on February 13, 1986. On February 17, 1986, however, while the jury was still deliberating, there were radio reports and newspaper articles detailing the circumstances of the apparent suicide of Frederick DiNome, one of the government's major witnesses during the trial. That same day, I conducted a general inquiry of the jury to determine whether they had been exposed to this publicity to which they indicated that they had not. I went on to emphasize to the jury, as I had done repeatedly throughout the trial, that they were "to avoid at all costs newspapers and radio programs." Tr. 7306.

Thereafter, over the next few days, there were additional articles in the local newspapers regarding DiNome's death. During this time, at the jury's request, the jury was deliberating an average of twelve hours a day, from 10:00 a.m. to 10:00 p.m. They were, without question, one of the most responsible and conscientious groups of people I have ever encountered. Throughout the remainder of their deliberations, I reminded the jury again and again of the importance of avoiding the news in any form. On a number of occasions defense counsel requested that because of the publicity about DiNome I declare a mistrial or conduct an individual voir dire of the jurors. I denied these requests, however, because the jurors had already sufficiently demonstrated their steadfast allegiance to the court and its instructions. I concluded that subjecting the jurors to the "third degree" in the midst of their deliberations was unwarranted and, if anything, would simply fuel speculation that something significant relating to the case had happened and thus only serve to distract the jurors from the arduous task already before them.

Perhaps the most significant evidence that the jury had not been affected by any of the publicity generated during the trial was the jury's verdict and the length of its deliberations. The verdict ran the gamut from fifty-eight findings of guilty to ninety findings of not guilty to being deadlocked on two defendants on one count. The jury deliberated from February 13 through March 5, 1986 and sent out fifty-six notes asking for many hours of testimony to be read back, exhibits, stipulations, and re-readings of the jury charge. After the trial was over, members of the jury were heard to say, *inter alia,* that Castellano's death and anything they had heard regarding Castellano did not enter into their deliberations at all and that the defendants could not have had a more fair jury. Although, of course, I cannot personally verify the former statement, as to the latter, to my view, there can be no doubt.

In sum, for the reasons set forth above, all of defendants' applications for a mistrial due to prejudicial publicity were denied.

SO ORDERED.