**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James R. LORD, Jr., Gerald J. Yagy, and Gerhardt J. Schwartz, Defendants-Appellants.**

Nos. 124, 125, 126, Dockets 77–1157, 77–1158, 77–1159.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1977.
Decided Nov. 15, 1977.

Alfred P. Kremer, Rochester, N. Y., for defendant-appellant Lord.

Roy E. Colicchio, Rochester, N. Y., for defendant-appellant Yagy.

Barry Bassis, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for defendant-appellant Schwartz.

Gerald J. Houlihan, Asst. U. S. Atty., Rochester, N. Y. (Richard J. Arcara, U. S. Atty. for the Western District of New York, Buffalo, N. Y., of counsel), for plaintiff-appellee.

Before MANSFIELD and TIMBERS, Circuit Judges, and DOOLING, District Judge.*

MANSFIELD, Circuit Judge:

After a four-day trial in the Western District of New York before Judge John T. Elfvin and a jury, appellants Lord, Yagy and Schwartz were convicted of bank robbery, 18 U.S.C. § 2113(a), and conspiracy to commit bank robbery, 18 U.S.C. § 371. Lord and Schwartz were also convicted of armed bank robbery, 18 U.S.C. § 2113(d). We reverse because of two errors that seriously jeopardized the defendants' right to a fair trial: (1) the Government's disclosure to the entire venire during jury selection of highly prejudicial information that was later excluded from evidence, and (2) the district court's refusal during the course of the trial to inquire whether members of the jury had seen or read newspaper articles containing prejudicial information not in evidence.

On April 9, 1976, the Columbia Banking Savings and Loan Association in Rochester, New York, was robbed of approximately $43,365 by two armed men wearing stocking masks, coveralls and gloves.

The evidence adduced at trial showed that Lord and Schwartz entered the bank and carried out the robbery. Yagy's role was that of mastermind and planner, who did not participate in the execution of the crime but conferred in advance with the others and recruited 17-year old Ronald Hook, a delivery boy in his Rochester, New York, pizzeria, to drive the getaway car. All four shared in the proceeds. Three months after the robbery Lord and Schwartz, for reasons that are not entirely disclosed in the record, assaulted Hook, stabbing him with an ice pick approximately 45 times. Hook, who was not indicted, survived and became the Government's principal witness.

At trial Hook incriminated the defendants, describing the planning and execution of the crime and the part played by each of the defendants in it.[1] He further indicated that the stabbing incident was not connected with the bank robbery. However, the reason or reasons for the stabbing remained undisclosed. In addition, the Government relied upon a confession given by Schwartz to agents of the Federal Bureau of Investigation admitting his involvement, which was received against him only. The Government also offered the testimony of an FBI agent that when interviewed less than seven hours after the robbery Lord had $1,300 in his possession, even though he had been unemployed for several months. Lord told the agent that he had been at the hospital visiting his mother at the time of the robbery. Testimony of a hospital nurse, however, would permit a jury to infer that

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. Because of their disguises, neither Lord nor Schwartz could be identified by the bank's surveillance photos or by witnesses in the bank at the time of the robbery, other than to show a physical resemblance.

Lord's alibi was false. Another witness, Dennis Wakefield, testified that one week prior to the Columbia Savings and Loan robbery Lord and Schwartz disclosed to him their plan to rob a bank.

In March 1977 Schwartz was sentenced to 25 years imprisonment on the bank robbery counts and five years on the conspiracy charge, to run consecutively. Yagy was sentenced to 10 years imprisonment on the bank robbery count and five years on the conspiracy count, to run consecutively, and Lord was sentenced to 20 years on the bank robbery counts and five years on the conspiracy count, to run consecutively. Upon this appeal from the judgments of conviction numerous errors are claimed by the appellants, only a few of which warrant discussion.

## DISCUSSION

### The Stabbing Incident

■■■ At a pretrial conference approximately one month before trial, defense counsel moved to preclude any evidence of the stabbing incident from the trial on the ground that it was unrelated to the bank robbery and unfairly prejudicial. The Government opposed the motion, contending that "one of the reasons" for the assault was "Hook's threat to disclose their [appellants'] involvement in the Columbia bank robbery" and that evidence of the assault was admissible as proof of "the guilty minds of the defendants."[2] The court denied the motion without prejudice to its renewal but prophetically observed that "great prejudice . . . attends that evidence."

On February 8, 1977, jury selection commenced. During voir dire of the jury panel, the prosecutor, without advance notice to

the court or parties, stated in the presence of the entire venire:

"One of the Government witnesses in this case is a young man named Ronald Hook, and there was some publicity concerning Mr. Hook at one time as to the fact that he was stabbed some 45 times. . . ."

All defense counsel immediately moved for a mistrial, arguing that the jury panel had been irreparably exposed to unfairly prejudicial information that would make impossible the jurors' impartial evaluation of the evidence in the case. The court denied the motions, but repeatedly warned the prosecutor that a mistrial would be declared if the Government failed to establish the admissibility of the evidence concerning the assault.

When the voir dire resumed, a member of the panel responded to the prosecutor's comment by stating within the presence and hearing of all other prospective jurors, "I do recall the case now about this fellow by the name of Hook. I think he was stabbed because he didn't get his share of the money." Motions for a mistrial were renewed and denied. Another member of the panel then offered the candid opinion that knowledge of the stabbing would lend credence to Hook's testimony. Again motions for a mistrial were made and denied. The jury was then selected from the panel that had heard the references to the assault.[3]

Three days later, when the Government in its examination of Hook as its witness sought to establish the relevance of the assault to the Columbia bank robbery conspiracy through Hook's testimony, Hook denied that he had been attacked because of appellants' fear that he would inform the

---

**2.** Evidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt, *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973). However, the necessary predicate for the admission of Hook's assault was some evidence that the stabbing was related to the Columbia bank robbery.

**3.** Before the jury was selected, most, if not all, of the panel members were individually asked by defense counsel whether they could disregard the prosecutor's reference to the stabbing. Two veniremen said they would have difficulty in doing so. One panel member was excused for cause on that basis. After some hesitation, the other venireman asserted that he could disregard the assault if it were not admitted in evidence during the trial.

police about the bank robbery.[4] The court immediately prohibited any further questioning about the meeting that culminated in the assault and ruled, out of the jury's presence, that "Mr. Hook has taken away all relevancy to the stabbing episode by his answer that it had nothing to do with the bank robbery." Defense counsel once again renewed their motions for a mistrial, which were once more denied.

■ In view of the serious inflammatory impact which disclosure of the stabbing incident might have upon the jury, it was obviously improper for the prosecutor unilaterally to inform the panel of the matter, even if he believed that proof of it would later be admitted as evidence of guilty consciousness on the part of the defendants, *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973). We are not persuaded by the Government's argument that it was appropriate to inject the incident into the case at this early stage in order to determine whether the jurors might have been prejudiced by publicity that had been given to the incident when it occurred. It was most unlikely that the Government would suffer prejudice from this publicity; only the defendants could be hurt. Under the circumstances it was for defense counsel rather than the Government to determine what type of voir dire

questioning would best protect the defendants' right to a fair trial. Since defense counsel had, by their motion to exclude the assault evidence, made it clear that they believed it to be in their clients' interest to leave the matter alone we cannot accept the argument that the prosecutor acted out of solicitude for their interests rather than because disclosure of the information might help the Government's case against them.

■ Confronted with the prosecutor's highly inflammatory and improper remark, the district judge erred in not either declaring a mistrial immediately, with directions that jury selection commence as soon as a new, uncontaminated panel could be convened, or conducting a preliminary hearing outside of the panel's presence to determine whether it was likely that evidence of the stabbing would properly be admissible during the trial, in which event selection of the jury could be resumed from the same panel.[5] In any event, whether or not a mistrial was required during jury selection, it became imperative when the Government not only failed to elicit that the stabbing was relevant to the robbery but, on the contrary, brought out that it was unrelated. In our view the trial judge at that point should certainly have adhered to his originally-expressed intent to declare a mistrial.

The attempt on Hook's life is the type of evidence that, even if relevant, might have

4. In pertinent part Hook testified:
"Q. Mr. Hook, directing your attention to the 12th or 13th of July, did there come a time that you had a conversation in front of the pizzeria?
A. Yes, sir.
Q. And who was there at that time?
A. Gerald Yagy, James Lord.
* * * * * *
Q. Did you have a conversation with Mr. Yagy at that time?
A. Yes, sir.
Q. And what, if anything, did he tell you at that time?
A. He told me he would have liked to see me get out of town for a few days because the police were going to come and question me.
* * * * * *
Q. Was there a conversation at that time about pressure being put on you by the police?

Mr. Kremer: Objection, leading.
The Witness: Yes.
The Court: I will allow it under the circumstances. Overruled.
Q. And that was in connection with the bank robbery, is that correct?
A. No, sir.
Mr. Kremer: I'm sorry.
Mr. Morehouse: The answer is no.
Mr. Colicchio: Your Honor, at this time—
The Court: All right. The rules have changed. The jury will ignore that. That is stricken from the record, the jury will ignore it."

5. Since Hook was to be called as the Government's principal witness, he was undoubtedly available for immediate interrogation at such a preliminary hearing on the subject of whether the stabbing was related to the Columbia bank robbery.

to be excluded because of its potential for creating unfair prejudice. Fed.R.Evid. 403. Cf. *United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976); *United States v. Malizia*, 503 F.2d 578 (2d Cir. 1974) (death threat evidence unrelated to the offense charged ordinarily kept from jury). Disclosure of less inflammatory information has been held to be a proper ground for the declaration of a mistrial. See, e. g., *United States v. Gentile*, 525 F.2d 252 (2d Cir. 1975) (prosecutor's reference to defense of entrapment in opening statement); *United States v. Cook*, 530 F.2d 145 (7th Cir. 1976) (testimony relating to one defendant's confession included possibly inculpatory reference to co-defendant); *United States v. Gori*, 282 F.2d 43 (2d Cir. 1960) (prosecutor's questioning suggested defendant's participation in other crimes). Moreover, this is not a case where the trial judge was called upon to exercise discretion in weighing the probative value of evidence against its prejudicial effect, an exercise that will not usually be disturbed except upon a showing of arbitrariness or irregularity, see *United States v. Robinson*, 560 F.2d 507 (2d Cir. 1977) (en banc), but an instance where the highly inflammatory information had no probative value whatsoever. Whatever discretion the trial judge might have had to declare a mistrial under other circumstances—and we recognize, as Justice Story observed in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), that "it is impossible to define all the circumstances which would render it proper"—we are satisfied that he had no alternative but to do so in this case. Revelation that the Government's main witness, a teenage young man, had been the victim of a multiple stabbing by two of the defendants posed a high risk that the jury would be prejudiced against them in its consideration of the charges. It is no answer, as the Government argues, that the prosecutor did not name Hook's attackers. While the statement did not indicate who wielded the ice pick, the comment volunteered by a member of the venire—that Hook was stabbed "because he didn't get his share of the money"—made appellants' participation in the assault an irresistible inference.

Nor could it be argued that the jury's memory of the assault might have been dimmed by the length of the trial or the testimony of many witnesses. The trial lasted only four days. Hook's testimony was the heart of the Government's case. Moreover, Hook's gratuitous references during cross-examination to the "unfortunate incident" and the time he spent "in the hospital" only served to remind the jurors of the assault. The only proper course was for the trial judge to follow his originally-expressed intent to grant the defendants' motion for a mistrial if evidence of the stabbing should be excluded.

### The Failure to Inquire into the Jury's Exposure to Prejudicial Publicity

Appellants' second claim on appeal concerns the district court's response to the publication of several newspaper articles during the trial that contained incriminating and prejudicial information not in evidence. On February 11, 1977, the third day of the four-day trial, defense counsel brought to the court's attention an article that had appeared that day in the only morning newspaper of general circulation in the Genesee region, with a daily distribution of 200,000 copies, describing the previous day's trial proceedings and stating "He [Hook] is now in the federal Witness Protection Program after recovering from an assault July 16 in which he was stabbed 47 times with an ice pick."

Defense counsel asked the court to poll the jury to see if any juror had seen the article, and if so to conduct an individual voir dire to determine the extent and effect of that juror's exposure to the information. The Government contended that the article contained no inaccuracies, and that since it did not specify Hook's attackers, no inquiry was necessary. The court declined to examine the jury, stating that it preferred to rely on its general admonitions to the jury to avoid media coverage of the trial and that "to say something in addition  . . .  relating to the particular articles is going to only make those articles, I think, a magnet for them [the jury], which they will seek out and read, whereas if they follow my general instructions, they will not."

On the following day, February 12, 1977, defense counsel brought to the court's attention another article that had been published on the afternoon of February 11, 1977. The article contained the same reference to Hook's assault, and to the fact that he was in protective custody. A third article, which had appeared on the morning of February 12, 1977, was also discussed. The article described Schwartz as having been on the "FBI's Ten Most Wanted List." It characterized the Columbia Savings and Loan robbery as "one of the largest here in the past twenty years" according to the FBI and contained a description of Hook's assault and of his membership in the Witness Protection Program.

None of these plainly prejudicial details about Schwartz's "Ten Most Wanted" status or the FBI's opinion concerning the seriousness of the bank robbery were ever introduced·into evidence at the trial. Nor, of course, was evidence of the assault on Hook or his membership in the Witness Protection Program ever before the jury. The court again refused to examine the jurors about the possibility of their exposure to the newspaper articles, stating:

"The jury had been strenuously admonished not to involve itself in any way with the media. I share your misgivings as to whether or not they in fact do follow those instructions, but I can only surmise they do, failing some other showing. . . . you may have some misgivings, as attorneys, as to whether in fact that is true, but I go along with the fact it is true." (Tr. 798–99, Feb. 12, 1977).

■ In our view the district court erred in relying solely on repetitive admonitions to the members of the jury to avoid news coverage of the trial. The circumstances of this case required more. The widespread availability of the newspapers as well as the prominent position occupied by the articles,[6] created a strong possibility that some jurors might have been exposed to the irrelevant and prejudicial matter in the publicity. Under such circumstances it is not enough to assume that jurors will faithfully observe general cautionary instructions, in view of some experience to the contrary, see, e. g., *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968) (juror ignored instructions and kept collection of newspaper clippings pertaining to trial).

■ The guidelines to be followed by a district court confronted with the problem of publication or broadcast of information concerning an ongoing criminal trial have been indicated by us. See, e. g., *United States v. Pfingst,* 477 F.2d 177, 186 (2d Cir. 1973); *United States v. Bentvena,* 319 F.2d 916, 934 (2d Cir.), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *United States v. Agueci,* 310 F.2d 817, 831–32 (2d Cir.), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Accord, *United States v. Perrotta,* 553 F.2d 247 (1st Cir. 1977); *United States v. Pomponio,* 517 F.2d 460 (4th Cir. 1975); *United States ex rel. Greene v. New Jersey,* 519 F.2d 1356 (3d Cir. 1975); *Margoles v. United States,* 407 F.2d 727 (7th Cir. 1969); *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968). See also American Bar Association Project on Minimum Standards for Criminal Justice, Fair Trial and Free Press § 3.5(f) (1968). First the court must decide whether the publicity contains potentially prejudicial information, and whether the members of the jury might have been exposed to it. If the broadcast or article contains no information beyond the evidence in the case, or if the information is clearly innocuous or the possibility of the jury's exposure to it is remote, further inquiry may not be necessary. If, however, the court determines that the article or broadcast has a potential for unfair prejudice,[7] then an initial inquiry of the jury is necessary to ascertain whether any of its members have been exposed to the information. Any juror who responds that he or she has been so exposed should be examined individually, out of the pres-

---

6. The two articles published on February 11, 1977, and February 12, 1977, appeared on the front page of the second, or "B," section of the Rochester, New York *Democrat and Chronicle.*

7. Typical information of a prejudicial nature, for instance, would be a defendant's prior criminal record, *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), or

ence of the other jurors, to determine the extent of the exposure and its effect on the juror's attitude toward the trial. This precautionary procedure should permit the court to determine what further steps, if any, are required to insure that the trial proceeds fairly.

*Miscellaneous Other Claims*

■ Although the other claims raised on appeal do not merit any relief, some discussion is advisable, in view of the prospect of a retrial. Lord and Yagy contend that they were entitled to a severance, principally because of the alleged spill-over effect created by the admission of Schwartz's confession. However, that confession, as redacted, described only Schwartz's own involvement in the bank robbery. Although Schwartz had provided the FBI with other statements implicating Lord and Yagy in the bank robbery, the court properly excluded them. Since the Schwartz confession in evidence incriminated only himself, its admission did not violate *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Lord and Yagy contend, however, that they were entitled to a severance because the admission of the confession violated "the spirit" of *Bruton,* since it corroborated many of the details of Hook's testimony and thus added weight to the evidence against him. We disagree.

■ The argument boils down to a claim that appellants would have had a better chance of acquittal in a separate trial at which Schwartz's confession would have been excluded. However, as we have frequently observed, see generally *United States v. Cassino,* 467 F.2d 610 (2d Cir. 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973), and cases cited therein at notes 37–39, this is not enough to warrant our interfering with the trial judge's discretion in the matter, which is

broad. Fed.R.Crim.P. 14. Persons accused in one indictment of joint participation in a crime are normally tried together, absent a showing of substantial prejudice, as to which the defendants bear a heavy burden. Appellants' argument, which would preclude virtually any joint trial in which a defendant's self-inculpatory statements are admitted, does not satisfy that burden or require us to disturb the trial judge's ruling in this case.

Appellants next challenge the admission of Schwartz's confession on the ground that it was obtained in violation of his right to counsel and right to a prompt arraignment. The basis of the claim is the eight-hour delay between the time of Schwartz's arrest and his appearance before the magistrate. During this period he confessed.

■ Since Schwartz had been indicted prior to his arrest and his right to counsel had therefore attached before he was arrested, the use of his confession at trial was unconstitutional unless he waived his Sixth Amendment right to counsel before he confessed.[8] *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Satterfield,* 558 F.2d 655 (2d Cir. 1976). When Government agents or prosecutors choose to interrogate an indicted, unrepresented defendant, they assume the heavy burden of proving that any inculpatory statements thus obtained were voluntarily given after a valid waiver of the right to counsel. *United States v. Satterfield, supra; United States v. Massimo,* 432 F.2d 324, 327 (2d Cir. 1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971) (Friendly, C. J., dissenting). We believe that burden was met in this case.

■ The salient factor in our decision is that Schwartz confessed after approximately one-half hour of questioning. The balance of the eight hours that elapsed between the arrest and appearance before the

---

clearly incriminatory out-of-court conduct, *United States v. Leviton,* 193 F.2d 848 (2d Cir. 1951), *cert. denied,* 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350 (1952). However, other out-of-court events involving a party, even though labelled "non-prejudicial," may require an inquiry to insure that the jury's verdict is based

on the evidence adduced at trial rather than upon information not in evidence before it.

8. No claim is raised that the confession was obtained in violation of Yagy's rights under the Fifth Amendment.

magistrate was consumed by travel, routine booking procedures, and transcription of the confession. Moreover, nothing in the record leads us to believe that Schwartz did not waive his rights voluntarily and with a full appreciation for the significance of his admissions. He was orally advised of his Fifth and Sixth Amendment rights upon arrest. He read and signed the standard "advice of rights" form and a waiver form. Unlike the defendant in *United States v. Satterfield, supra,* Schwartz was not an individual "distraught, upset, weeping and obviously out of control" while in custody. Having been arrested three times prior to the occasion at issue, he was familiar with his rights.

█ Appellant Yagy contends that he was denied his right to a speedy trial under 18 U.S.C. §§ 3161, *et seq.,*[9] the Sixth Amendment, and Fed.R.Crim.P. 48(a). The claim borders on the frivolous. Yagy was tried 193 days after his arraignment. The Speedy Trial Act, 18 U.S.C. § 3161(g) required that he be tried no later than 180 days following arraignment, subject to the exclusion of certain periods pursuant to 18 U.S.C. § 3161(h). The Government filed its notice of readiness to proceed to trial within 90 days of Yagy's arrest. When it became apparent that Judge Burke's illness would delay the trial, the Government moved to have the case reassigned.

Furthermore, at least several weeks of excludable delay is attributable to the defendant's illness. Title 18 U.S.C. § 3161(h)(3)(A) provides that any period of delay resulting from the absence or unavailability of the defendant "shall be excluded" in computing the time within which the defendant's trial should have commenced. On October 12, 1976, shortly before trial was to have begun before Circuit Judge Van Graafeiland, who had consented to try the case due to Judge Burke's absence, counsel for Yagy sent an affidavit to Judge Van Graafeiland stating that Yagy had recently been admitted to the hospital for surgery, and "will be indisposed either at said hospital or otherwise recuperating at his home . . . for a period of at least four (4) weeks." On October 25, 1976, still well within the 180-day limit, Judge Elfvin consented to try the case. Pretrial motions were argued before him on that date. During the arguments on the motions, counsel for Yagy asserted that Yagy's physical condition would prevent him from attending a trial until at least mid-November. A supporting letter from Yagy's surgeon was also presented to the court. When excludable periods are taken into account it is clear that Yagy's rights under the Speedy Trial Act were not violated. Moreover, the sanction of dismissal for failure to abide by the time limits of that Act does not become effective until July 1, 1979, 18 U.S.C. § 3163(c), except for certain provisions not applicable here, see 18 U.S.C. § 3164. See also *United States v. Carini,* 562 F.2d 144 (2d Cir. 1977).

█ When Yagy's additional claims that his speedy trial rights under the Sixth Amendment and Fed.R.Crim.P. 48(b) were violated by the delay between his arrest and trial are viewed against the well-settled criteria of (1) length of the delay, (2) reasons for the delay, (3) prejudice to the defendant, and (4) waiver, *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d

9. The Speedy Trial Act time limits, although hortatory until July 1, 1979, 18 U.S.C. § 3163(b), apply to this case, and have been implemented in the Western District of New York by that court's adoption of its "Plan for Prompt Disposition of Criminal Cases," effective July 1, 1976, which does authorize the court to dismiss an indictment for failure of the Government to be ready within six months. (Here the Government was ready in 90 days.) Section 3163(b) of the Act states that the time limits in § 3161(c) shall apply to all offenses charged in informations or indictments filed on or after the date of expiration of the 12-calendar month period following July 1, 1975. The indictment charging Yagy was filed on July 29, 1976.

Although 18 U.S.C. § 3161(c) provides that a criminal defendant who has entered a plea of not guilty must be tried within 60 days from his arraignment, that time limit is modified by § 3161(g), which provides that notwithstanding the "provisions of subsection (c) of this section, for the first twelve-calendar-month period following the effective date of this section as set forth in section 3163(b) of this chapter, the time limit with respect to the period between arraignment and trial imposed by subsection (c) of this section shall be one hundred and eighty days, . . . .."

101 (1971), we find them unpersuasive. Furthermore, in light of his failure to allege any prejudice resulting from the delay, we find it unnecessary to discuss the *Barker* criteria in any detail.[10]

Appellants next claim that they were unfairly prejudiced when the district court made a finding that sufficient proof of Yagy's participation in the bank robbery conspiracy existed to permit the receipt in evidence of certain hearsay against him. See generally *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969). Specifically, appellants contend that in making this finding orally in the jury's presence, the court appeared to be telling the jury that sufficient evidence existed to establish the conspiracy charge.

We agree that the better practice is to make the finding out of the jury's presence. However, the possible prejudice that could have resulted from the court's comment is far outweighed by the substantial evidence of guilt in the case. When the court's comment was objected to, the trial judge quickly instructed the jury that the issue of the existence of the conspiracy was for them to decide.

Finally, Yagy contends that he was unlawfully sentenced consecutively for the bank robbery and conspiracy. The alleged defect in the court's sentence stems from the fact that Yagy's bank robbery conviction was based on an aiding and abetting theory. He contends that aiding and abetting is identical to conspiracy and that since he was sentenced to consecutive terms he is being punished twice for the same offense. The law, however, is to the contrary. As we stated in *United States v. Crosby,* 314 F.2d 654 (2d Cir. 1963), "separate sentences may be imposed for violating a criminal statute and for conspiring to violate it . . . even when the sole evidence of commission of the substantive offense is participation in the conspiracy, which makes the defendant an aider or abettor of the substantive crime." *Id.* at 657 (citations omitted).

Yagy committed two crimes. He agreed to rob a bank, which together with the commission of an overt act, constituted conspiracy. In the course of that conspiracy, he aided and abetted the bank robbery. We therefore find no legal basis for challenging the court's sentence.

We have carefully reviewed the other claims raised by appellants, and find them to be without merit. For the reasons stated the judgments of conviction entered with respect to each appellant are reversed. The case is remanded to the district court for retrial.

---

**10.** The only suggestion of prejudice is Yagy's contention that an earlier trial would have allowed him to be tried separately from Schwartz, who was arrested four months after Yagy's arrest. While this may be true, it is not an interest the Sixth Amendment was designed to protect. *Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. 2182.