**UNITED STATES of America, Plaintiff,**

v.

**Estanislao PIMENTEL, Defendant.**

**No. 78 Cr. 234 (GLG).**

United States District Court,
S. D. New York.

Nov. 6, 1978.

Robert B. Fiske, Jr., U. S. Atty., New York City, for plaintiff by Don D. Buchwald, Asst. U. S. Atty., New York City.

Beldock, Levine & Hoffman, New York City, for defendant by Elliot G. Sagor, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

Defendant Estanislao Pimentel has moved to suppress statements he made to Assistant United States Attorney (AUSA) Denise Cote during a post-indictment interview. He alleges that the statements were elicited in violation of both the Fifth and

Sixth Amendments. The Court held an evidentiary hearing on the motion on September 13, 14, 15 and 21, 1978, and the evidence established the following facts.

### Facts

Pimentel was indicted on April 7, 1978 and charged, along with others, with participation in a fraudulent income tax refund check scheme. At that time, as he was in the Dominican Republic and technically, at least, a fugitive, a warrant was issued for his arrest. By July 20th, Pimentel had returned to the United States, and on that day, three Internal Revenue Service (IRS) agents served the warrant and arrested him after they had located him in his apartment, hiding in a closet. The defendant was read his *Miranda* warnings in English (the evidence showed that the defendant has some knowledge of English but is more proficient in Spanish) and was shown and had read to him his arrest warrant. Before being taken from the apartment, Pimentel was allowed to dress in clothing chosen for him by his "common law" wife.

The defendant was taken from his apartment at approximately 11:00 p. m. and driven directly to the Metropolitan Correction Center (MCC). No stop for processing or interrogation was made at IRS offices. He was logged in at the MCC at 11:35 and put through the normal processing procedures. The next morning Pimentel apparently chose to forego breakfast (he testified that at the time he was not hungry). He made no request for food while at the MCC, or later to the IRS agents or the AUSA.

At 10:05 a. m., the defendant was taken from the MCC first to the United States Marshal's office for processing (fingerprinting, photographing etc.), and then to the United States Attorney's Office where he was interviewed by AUSA Cote. Throughout the questioning, which began at 10:50 a. m., an interpreter was present who translated the proceedings into Spanish for Pimentel. AUSA Cote advised the defendant that an indictment had been filed against him, described the crimes charged, and handed the interpreter a copy of the indictment so that he could translate aloud all counts (numbers 1, 32–36) in which the defendant was named. The defendant was also handed the copy to read himself. He was informed that he would soon be brought before a Magistrate who would fix bail in the case (the interview actually took far longer than usual, about two hours, due to the necessity for translation throughout). Prior to asking any questions, AUSA Cote advised the defendant of his constitutional rights, and questioned him as to his understanding of them. The Court finds that the following warnings were given:

Cote: Before you say anything let me finish advising you of your rights. You have a constitutional right to refuse to answer any of my questions. Do you understand that?

Pimentel: I have the right to refuse to answer any question. If you say a question I know to be true I'll say yes. If not I'll say no.

Cote: You can refuse to answer *any* question. Do you understand that?

Pimentel: Yes.

Cote: You have an absolute right to remain silent and if you chose [sic] to answer any questions, any statements you do make can be use against you in a court of law. Do you understand that?

Pimentel: Yes.

Cote: You have a right to consult an attorney and to have that attorney present during this interview. Do you understand that?

Pimentel: Yes.

Cote: If you do not have funds to retain an attorney, an attorney will be appointed to represent you and you do not have to answer any questions before this attorney is appointed and you can consult with this attorney. Do you understand that?

Pimentel: Yes.

Cote: You may pick and chose [sic] those questions you wish to answer, and you may stop at any time. Do you understand that?

Pimentel: Yes.

Cote: Understanding your rights, are you prepared to answer questions without an attorney?

Pimentel: Yes.

Cote: You've heard the charges against you. Do you have a statement to make?[1]

Pimental at no time during the interview requested an attorney, nor had he previously retained an attorney.

Following this exchange, AUSA Cote asked, and Pimentel answered, various questions concerning the charges. The defendant's answers were responsive, sometimes providing more information than called for, and they were in content essentially exculpatory. Although he admitted to performing certain acts, which were already known to the Government, he denied having any intent to violate, or knowledge of any violation of, the law. No admission of a crime was made. The defendant now alleges that he was confused and upset during the interview, but the testimony elicited at the hearing indicates that, at least in his outward appearance, he was calm and relaxed. While the defendant did remain in handcuffs during the interview, contrary to usual United States Attorney's Office practice, the defendant did not seem to be in discomfort from them, nor did he complain about them in any way. No threats or promises were made by the AUSA to the defendant during the course of the interview, nor was any trickery used. The interview concluded at 1:40 p. m. At 3:55 p. m. the defendant was presented before Magistrate Sinclair, where he was again advised of his rights. At no time before the Magistrate did the defendant claim that he did not understand his rights or the nature of the proceedings against him.

### Discussion

■ Pimentel's most serious contention is that his right to counsel under the Sixth Amendment has been violated. Such right attaches when adversary judicial proceedings have begun. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). As the Court stated in *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977), "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Adversary judicial proceedings against Pimentel began upon the filing of his indictment. Thus, at the time of his AUSA interview, his Sixth Amendment right to counsel had clearly attached.

■ Even when a defendant's Sixth Amendment rights have attached, however, he may still validly waive his right to counsel. *United States v. Lord,* 565 F.2d 831, 839–840 (2d Cir. 1977); *United States v. Armedo-Sarmiento,* 545 F.2d 785, 792 (2d Cir. 1976). *But see United States v. Massimo,* 432 F.2d 324, 327 (2d Cir. 1970) (Friendly, J., dissenting). For a waiver to be found valid the burden is placed upon the Government to prove that it was both knowingly and voluntarily given. This burden has been held to be heavier than that which is required in showing a voluntary waiver in the Fifth Amendment context. *United States v. Lord, supra; United States v. Satterfield,* 558 F.2d 655 (2d Cir. 1977). It was held in *Lord, supra* at 839, that "[w]hen Government agents or prosecutors choose to interrogate an indicted, unrepresented defendant, they assume the heavy burden of proving that any inculpatory statements thus obtained were voluntarily given after a valid waiver of the right to counsel."

■ Justice Black, writing for the Supreme Court, in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1937) stated: "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular

---

1. Transcript of statement of defendant after indictment and before arraignment made to Assistant United States Attorney. While this transcript was compiled from notes of the interview which were kept by AUSA Cote, the warnings which were given were read from the standard United States Attorney's form used for advising a defendant of his rights.

facts and circumstances surrounding that case, including the background, experience and conduct of the accused." In order for an accused to be able to make a knowledgeable waiver he must first be "informed of the nature and cause of the accusation." In *United States ex rel. Lopez v. Zelker,* 344 F.Supp. 1050 (S.D.N.Y.1972) (Frankel, J.), the court held that this requires informing a defendant against whom an indictment has already been filed about the existence of that indictment, prior to asking him whether he wishes to waive his right to counsel. If such information is not provided, an accused cannot make an intelligent, knowing waiver of his right, and any waiver made under such circumstances would be ineffective. *See id.*

■ In this case, Pimentel was informed by the AUSA that he was under indictment and was given a copy of it to read. He claims, however, that due to his very limited knowledge of English he was unable either to read the indictment or to understand the nature of it.[2] This Court does not agree. Pimentel, in addition to receiving a copy of the indictment to read, also had the relevant parts of it read to him in Spanish. The interpreter read to him the caption of the indictment, the body of the conspiracy count (Count I), all overt acts in which he was named, and all of the substantive counts in which he was charged. The overt acts in which only other defendants were named were summarized and explained to him. Communication of this material to the defendant provided him with sufficient information to satisfy his right to be informed of the nature and cause of the accusation against him. Translation of the entire indictment, with its numerous counts and named defendants, would have been a very time consuming process which could only have served to confuse, and not to clarify matters for the defendant. The procedure followed by the AUSA went beyond that mandated in *Lopez, supra,* which only required that an accused be advised that he had been indicted. In light of the admoni-

tion of the Court of Appeals in *United States v. Diggs,* 497 F.2d 391, 393 n. 3 (2d Cir. 1974), that *Lopez* has "no precedential value," having been affirmed without opinion, this Court sees no need, nor has any inclination, to expand *Lopez* to require translation of the entire indictment even when only a part of it is relevant to a particular defendant.

■ We similarly reject the defendant's contention that since an indictment is an alien concept to him, not used in his native Dominican Republic, and since it was translated for him as "denuncia," a term which may connote something slightly less severe, he was unable to understand the nature of the charges. This contention cannot stand up in light of the facts, just discussed, that Pimentel had a copy of the indictment and had the relevant portions translated and explained to him. We agree with the Government that to suppress simply because there may be no literal translation of the concept of "indictment" in Spanish would be to "exalt form over substance," especially when, as it does here, the evidence shows that the defendant did know serious charges were lodged against him.

Pimentel further contends that his waiver was ineffective since he was not informed of his right to counsel in a manner which comports with the requirements of the Sixth Amendment (or even the "lesser" requirements of the Fifth). In light of the facts of this case, we cannot agree.

Defendant bases his argument on the decision in *United States v. Satterfield,* 558 F.2d 655 (2d Cir. 1977). In that case the court found that the prosecution had not met the heavy burden of showing a knowing and intelligent waiver of Sixth Amendment rights. The court's conclusion was based upon the fact that even if the defendant's "statements were voluntary for purposes of the fifth amendment, . . . they were involuntary with 'regard [to] the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached.'" *Id.* at

---

2. It seems clear from the evidence presented at the hearing that the defendant has a greater knowledge of English than he is willing to admit.

657, quoting *United States v. Massimo*, 432 F.2d 324, 327 (2d Cir. 1970) (Friendly, J., dissenting), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971). The defendant alleges that while the warnings given by the AUSA may have been adequate *Miranda* warnings, they were inadequate as *Satterfield* warnings.

■ We find, however, that Pimentel was adequately advised of his constitutional rights under both the Fifth and Sixth Amendments, and that he understood those rights. AUSA Cote explained to Pimentel that he had a right to consult an attorney, to have the attorney present during the interview, to have an attorney appointed for him if he did not have the funds, and that he did not have to answer any questions until that attorney was appointed and had an opportunity to consult with him. The evidence showed that the defendant acknowledged his understanding of these rights. Unlike *Satterfield supra* at 657, where the defendant was "distraught, upset, weeping and obviously out of control," Pimentel was clearly in control of his faculties and maintained, at least outwardly, a very clam demeanor. *See United States v. Lord*, 565 F.2d 831 (2d Cir. 1977). His answers during the interview were well thought out and, as indicated above, essentially exculpatory in substance. Nothing in his conduct at the interview suggests that this was anything but a knowing waiver by a man who knew he was under indictment, knew what the charges were against him, and knew that they were serious. We find, as was found by the Second Circuit in *Alexander v. Smith*, 582 F.2d 212 (2d Cir. 1978), that the defendant, "[w]ith full knowledge of his right to consult with an attorney, . . . of his own free will chose, for whatever reason, to abstain from any exercise of that right and he must now accept the consequences of that entirely volitional decision."

The instant case is not one where, as was the case in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), any preexisting relationship with counsel was infringed upon, or where the defendant had shown any prior reliance upon the advice of an attorney when dealing with the authorities.[3] Pimentel also cannot be compared with the defendant in *United States v. Callabrass*, 458 F.Supp. 964 (S.D.N.Y. 1978), who at the time of questioning was, with full knowledge of the Government, represented by counsel who was not present at the interview. Nor does this case exhibit the delay present in *Callabrass*, where an hour elapsed between the time when the defendant was informed of his rights and when he was questioned. Pimentel at no time during the course of the interview made any request that the questioning cease until he had an opportunity to obtain and consult with an attorney. *See United States v. Mespoulede*, 78 Cr. 256 (S.D.N.Y. June 30, 1978).

The Supreme Court in *Brewer, supra* 430 U.S. at 404, 97 S.Ct. at 1242, reaffirmed that the test to be followed in determining whether there has been a valid waiver is the *Johnson v. Zerbst* test of an "intentional relinquishment or abandonment of a known right or privilege." While the burden of proof for meeting this test has been held, in this circuit, to be higher in the Sixth Amendment context, *United States v. Lord, supra*, the Government has met that burden in this case. *Brewer* did not require *Faretta*-type[4] warnings be given in order to establish a waiver under the Sixth Amendment and we see no basis for so requiring here. While it may be prudent

---

**3.** The Supreme Court stated in *Brewer*:

"[W]aiver requires not merely comprehension but relinquishment, and . . . [the defendant's] consistent reliance upon the advice of counsel in dealing with the authorities refutes any suggestion that he waived that right." 430 U.S. at 404, 97 S.Ct. at 1242.

**4.** *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), dealt with the question of a defendant's right to defend himself *at trial*. In that context the Court found that it was necessary to inform the defendant of the "dangers and disadvantages of self-representation." *Id.* at 835, 95 S.Ct. at 2541. No reference to *Faretta* was made by the Supreme Court in *Brewer*, nor by the Second Circuit in *Lord* (though the Second Circuit had in its pre-*Brewer Satterfield* decision cited *Faretta*).

for the United States Attorney's Office to give a more extensive warning to an indicted defendant than they gave to Pimentel, a more extensive warning is not constitutionally mandated in order for the Government to show a knowing, intelligent waiver.[5] On the facts of this case, we find that such a knowing and intelligent waiver was made.

■ Pimentel also claims that his waiver of counsel was invalid since it was not voluntary. Upon examination of all the evidence, however, we find no basis to believe "that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . .'" United States v. Reed, 572 F.2d 412 (2d Cir. 1978), quoting United States v. Ferrara, 377 F.2d 16, 17 (2d Cir.), cert. denied, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967).

This Court does not agree with the defendant that there was any unnecessary delay in the period between the defendant's arrest at about 11:00 p. m. on July 20 and the completion of his AUSA interview at 1:40 the next day, approximately 13½ hours later. (He was presented before a Magistrate at 3:55 p. m. The period between 1:40 p. m. and 3:55 p. m. was, however, essentially for the benefit of CJA counsel, and is not attributable to the Government.) Most of the 13½-hour period was spent in transport, lodging, sleeping and various routine processings. The AUSA interview, though longer than usual, was not unreasonably long in light of the need for simultaneous translations. Courts have found far longer delays to be valid in similar circumstances. See, e. g. United States v. Collins, 462 F.2d 792, 795–96 (2d Cir. 1972) (26-hour period found permissible). As was held in United States v. Marrero, 450 F.2d 373, 376 (2d Cir. 1971): "It is not the lapse of time but the use of the time, when the commissioner or magistrate is unavailable, to employ the condemned psychologically coercive or third degree practices which is proscribed by the cases."

There is no evidence suggesting any impropriety on the part of the government officials who dealt with Pimentel. The IRS agents who arrested him used no unnecessary force, showed him the arrest warrant and fully advised him of his Miranda rights. They treated him courteously and did not attempt to question him. Similarly, there is no evidence of impropriety by officials at the MCC who processed the defendant, or by AUSA Cote. Ms. Cote identified herself to Pimentel, provided him with all the necessary information about his indictment, and advised him of his rights. She used no promises, threats or tricks to cajole a waiver, see e. g. Lynum v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), nor discussed the possibility of a lengthy sentence. See e. g. United States v. Armedo Sarmiento, 545 F.2d 785 (2d Cir. 1976). No attempt was made to intimidate him.

The defendant nevertheless contends that he was tired, hungry and confused and felt compelled "to explain like a child in front of his father." (Defendant's Post-Hearing Memorandum, at 23.) This Court cannot agree. We find little merit in his hunger claim, which is based upon his missing one meal, or his lack of sleep claim, when considered in light of the mental alertness he demonstrated during the interview. Similarly, we reject the defendant's allegation that, as a result of his upbringing under a tyrannical Dominican system, he was confused and felt compelled to answer all questions. The defendant is a man of at least ordinary intelligence who has lived in this country most of his adult life. He was carefully advised of his rights, and acknowledged understanding them. He was calm during the interview and handled the questioning adroitly. Whatever his knowledge of the Dominican system may be, it is clear that he understood that the practice in the United States was different, and that he did not have to answer. Compare United States v. Dizdar, 581 F.2d 1031, 1038 (2d Cir. 1978).

5. To the extent that Callabrass, supra, holds that the Sixth Amendment requires more extensive warnings, this Court declines to follow it.

Given the particular facts of this case, we agree that nothing in the AUSA interview was so intimidating or confusing as to overbear Pimentel's will to resist. *See United States v. Burgos*, 579 F.2d 747, 749–750, No. 78–1018 (2d Cir. 1978).[6] As in *United States v. Armedo-Sarmiento*, 545 F.2d at 792, the defendant's statement "gives no indication of having been made under coercion or duress," as he confessed to nothing, and made only what could be considered basically exculpatory remarks.

Examining the "totality of the circumstances,"[7] we find that the waiver of counsel by Pimentel and the subsequent statements he made were voluntary and not the result of a will overborne.

### Conclusion

We find that the prosecution has met its heavy burden of showing a knowing, intelligent and voluntary waiver by the defendant of his rights under both the Sixth and Fifth Amendments. Accordingly, the defendant's motion to suppress is denied.

SO ORDERED.

---

**6.** In *United States v. Burgos*, 579 F.2d 747, 749 750 (2d Cir. 1978), the Second Circuit was faced with an allegation that the defendant's "youth, lack of formal education and inability to speak English made the foregoing process [AUSA interview] so intimidating as to taint his confession." The Court rejected that contention, finding no evidence of psychological coercion or mistreatment, or of any use of threats or trickery, and refused to reverse the trial judge's determination that there had been "great solicitude" for the defendant's rights.

**7.** *See* 18 U.S.C. § 3501(b).