## UNITED STATES of America

v.

### Jerry TAYLOR, a/k/a "Robert Lee Brown", Defendant.

### No. 78 Cr. 596 (KTD).

United States District Court,
S. D. New York.

Nov. 15, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for the United States of America; Mary Jo White, Asst. U. S. Atty., New York City, of counsel.

Maloney, Viviani & Higgins, New York City, for defendant; Arthur J. Viviani, New York City, of counsel.

### OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendant Jerry Taylor, also known as Robert Brown, has moved to suppress certain statements made by him as well as all evidence derived from the use of such statements. A hearing was held before me on October 6 and 20, 1978 and counsel were granted leave to submit post-hearing memoranda. The following opinion constitutes my findings of fact and conclusions of law.

On the evening of June 16, 1978, Police Officers Frank Rogers and John Taglioni

were on duty in the vicinity of 139th Street between Lenox and Fifth Avenues. There they spotted defendant with his girlfriend Michelle Williams, both of whom were known to the officers from previous arrests and other encounters. Defendant was removing two tires of a vehicle known by the officers to be stolen, while Ms. Williams was sitting on the hood of an adjacent auto apparently serving as lookout. After removing the tires and carrying them into a nearby abandoned building, defendant attempted to break the chain lock that secured the hood of the vehicle. The officers then moved in to arrest both Ms. Williams and defendant. Defendant, fleeing into an abandoned building, successfully escaped the officers. Ms. Williams, however, was arrested and taken to the stationhouse.

Approximately twenty minutes after Ms. Williams' arrest, defendant appeared at the stationhouse to inquire after his friend. He was immediately arrested and given *Miranda* warnings. Defendant also signed his arrest sheet acknowledging in writing that he had received and understood his rights. Defendant neither asked for a lawyer nor evidenced an unwillingness to speak with any of those who questioned him.

Shortly thereafter, defendant volunteered that he had information concerning a shotgun stolen from a vehicle. The police were able to confirm that such a weapon had, in fact, been stolen from a Secret Service vehicle. Defendant denied any participation in the crime but began to provide the police with details of the theft while they all awaited the Secret Service Agents who had been notified of defendant's statements. Defendant was a registered informant with the Bronx District Attorney and had previously provided reliable information to the authorities.

Upon the arrival of Agents Steven Scott and Thomas Tully, they were escorted into the precinct's anticrime office. There they were briefed on what had transpired that evening and advised that defendant had received *Miranda* warnings. At approximately 12:30 a.m. they met with defendant. The agents did not re-administer the warn-

ings but did ask defendant to recount what he had already told the police. He then revealed that a man known as "Tippin T" had sold a shotgun to a man known as "Jew Baby." According to defendant, Tippin T also had binoculars, a Polaroid camera and gas grenades. All these items matched the description of items stolen from the Secret Service vehicle. Defendant said he also knew of a box containing bits and pieces of other equipment.

At this point Scott asked if defendant was part of the burglary ring. Defendant denied participation in the crime; he said that Tippin T was a business associate of his and that he knew of the stolen items because of this association.

The agents were apparently convinced that defendant was not a party to the crime. They then left the precinct and found the box of stolen property where defendant had said it would be. Upon their return, they asked defendant to come with them and point out the car with the grenades in it. Defendant was reluctant to do so for fear of being seen, but the agents assured him he would be safe if he kept low in the car. Taylor went with them and identified the car. They then returned to the precinct at approximately 3:00 a.m.

The Secret Service agents, having procured a search warrant based upon the information provided by defendant, executed the warrant and arrested Jew Baby. On June 20, 1978, they returned to the stationhouse where defendant identified Tippin T out of a photo spread. Scott then gave defendant $50 and thanked him for his cooperation. According to Scott, without defendant's aid the government agents could not have made a case.

Subsequently, on June 22, 1978, Tippin T was arrested. After receiving his rights, Tippin T accused defendant of being his accomplice in the theft and sale. Scott thereupon secured a warrant for defendant's arrest and on August 2, 1978, defendant was apprehended by the Newark, New Jersey Police. The Secret Service were notified and took defendant into custody on August 3rd. He was escorted to a Secret

Service office in Newark where he was photographed and fingerprinted. Defendant was advised of his rights and taken before a United States Magistrate. The Magistrate also gave defendant his rights and defendant waived his right to an attorney. However, defendant did not waive his right to a preliminary hearing on the question of probable cause for the charges against him and a hearing was set down for August 14, 1978. Defendant also executed a waiver of counsel form, indicating he was aware of his rights. He was then removed to the Metropolitan Correction Center (MCC).

Four days later, on August 7, Agents Scott and Tully visited him at the MCC. They once again advised defendant of his rights but he chose to speak to Scott without benefit of counsel. The inculpatory statements he made on August 7 are among the statements defendant seeks to suppress.

Defendant has moved to suppress three statements made by him. The first was the statement made to Officers Taglioni and Rogers on the evening of his first arrest, June 16, 1978. Defendant claims that there was no probable cause to arrest him and that, accordingly, any statement made by him should be suppressed. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

■ In this connection, defendant concedes that if I find the testimony of Officers Taglioni and Rogers credible, then probable cause has been established. He suggests, however, that his own version of the events of the evening is entitled to greater weight. According to defendant, at the time Ms. Williams was arrested, he was not near the car and did not run into an abandoned building. Rather, defendant testified, he was in a bar on Lenox Avenue from where he saw Ms. Williams apprehended. Thereafter, he went to the precinct to learn why she had been taken into custody.

Defendant suggests that his version should be credited for two reasons. First, he concludes that Officer Taglioni's assessment of Ms. Williams' activity as merely "looking" was an insufficient basis upon which to predicate an arrest. Defendant would have me believe that Ms. Williams' arrest was merely a sham, effected to get her known boyfriend into the precinct. Secondly, he argues that if Taglioni's version is credited, then it would be very unlikely for defendant to present himself at the precinct, since it was clear that just a short time before he had been seen in the midst of committing a crime.

After hearing testimony from the two officers and defendant, I conclude that the officers' version of the events of June 16 is the more creditable one. The officers' testimony as to Ms. Williams' activities on that evening reveals that she and defendant were seen during the course of the evening near the stolen car. On two occasions she glanced in the direction of the officers' unmarked vehicle and spoke to defendant, whereupon they quickly walked off. When defendant was later seen removing the tires from the car, Ms. Williams was sitting nearby. Based upon these events together with the fact that both defendant and Ms. Williams were known to the officers because of past arrests and involvement with stolen cars, the officers had ample cause to make the arrest.

Nor do I find defendant's later appearance at the stationhouse incredible. Defendant was not a stranger to the precinct. In the past, he had provided information to the police and it is likely that in presenting himself at the stationhouse he thought he might exchange information for leniency. Perhaps, when he initially fled, he thought he could elude the police. But after his girlfriend's arrest, it was not unlikely that he would soon be caught. To appear at the stationhouse in light of these circumstances was a reasonable action and does not, in my view, suggest defendant's lack of culpability.

■ The second statement which defendant seeks to suppress was that made to Agents Scott and Tully later in the evening of his arrest. These agents did not give defendant his *Miranda* warnings and ac-

cordingly, defendant urges, the statements made must be suppressed.

Under the circumstances of the instant case, the *Miranda* warnings did not have to be repeated. When the agents arrived at the precinct they questioned the officers regarding the administration of "rights." They were advised that he had, in fact, received them but that he was not involved in the thefts about which he spoke. Rather, he was merely "throwing the officers a bone", (Tr. 31–32)[1] apparently in the hopes of helping himself and his girlfriend.

Once a defendant has waived his right to counsel, there is no requirement that *Miranda* warnings be repeated every time he is questioned. *See, United States v. Paulton*, 540 F.2d 886 (8th Cir. 1976); *United States v. Maguire*, 396 F.2d 327 (9th Cir. 1968); *Moore v. Hopper*, 389 F.Supp. 931, 933–34 (D.Ga.1974) *aff'd* 523 F.2d 1053 (5th Cir. 1975). These warnings do not become stale so quickly. *United States v. Kinsey*, 352 F.Supp. 1176 (E.D.Pa.1972). Since defendant effectively waived his rights before the local police, he may not complain of a *Miranda* violation simply because the federal agents did not repeat those warnings a short time later.

■ Moreover, defendant was not implicated in the crime charged herein at the time he gave his statement. The agents apparently credited his story as to how he became privy to the information regarding the stolen gun. Their faith in him was evidenced by the payment of $50 to defendant following his identification of Tippin T. In such a situation, the failure to administer *Miranda* warnings does not mandate suppression since defendant was not a target of the investigation.

■ The last statement which defendant seeks to suppress is that made to federal agents while he was incarcerated at the MCC. Defendant claims that his sixth amendment right to counsel attached upon his appearance before the Magistrate in New Jersey and that his oral and written ·waivers of counsel were ineffective. Relying upon cases involving sixth amendment waivers following indictment,[2] he asserts that the Magistrate was required to comply not only with Rule 5 of the Federal Rules of Criminal Procedure, but also to tell defendant that it was advisable to have an attorney appointed. There is simply no authority for this position. Rule 5 of the Federal Rules of Criminal Procedure sets forth the procedure for advising a defendant of his rights at an initial post-arrest appearance before a Magistrate. In the case at bar, the Magistrate complied with the requirements of this Rule. I have uncovered no authority requiring more of her, notwithstanding the fact that upon indictment a defendant should be encouraged to have an attorney appointed. *See, e. g., United States v. Plattner*, 330 F.2d 271, 276 (2d Cir. 1964).

Defendant also contends that his waiver of an attorney was merely for removal purposes. Moreover, he suggests that because he was a heroin addict, a more incisive inquiry by the Magistrate would have demonstrated his incapacity to waive an attorney.

■ A review of the record belies these claims. First of all, defendant did not claim to be high on drugs when he appeared before the Magistrate and waived his right to an attorney. Rather, he was beginning to withdraw. The fact that he may have felt ill due to withdrawal, moreover, would seem insufficient to vitiate his waiver. Additionally, there is nothing in the record, aside from defendant's own testimony, to suggest that his understanding of his waiver was as limited as he suggests. The Mag-

---

1. Reference to the hearing on October 6, 1978 is designated as "Tr."

2. *United States v. Plattner*, 330 F.2d 271 (2d Cir. 1964); *United States v. Spencer*, 439 F.2d 1047, 1050 (2d Cir. 1971); *United States v. Duty*, 447 F.2d 449 (2d Cir. 1971); *United States v. Harrison*, 451 F.2d 1013 (2d Cir.

1971); *United States v. Calabro*, 467 F.2d 973 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1386, 35 L.Ed.2d 587 (1973); *United States ex rel. Martinez v. Thomas*, 526 F.2d 750 (2d Cir. 1975); *United States v. Satterfield*, 417 F.Supp. 293 (S.D.N.Y.), *affirmed*, 558 F.2d 655 (2d Cir. 1976).

istrate's statements would surely not cause him to believe he was waiving counsel solely for removal purposes. Indeed, the fact that she advised him of his right to a hearing on the question of probable cause, and that he invoked it, suggests a contrary conclusion. In short, based on the present record, I cannot give credence to defendant's claim that he misunderstood the nature of his waiver.

As his final point, defendant urges that the interrogation conducted by Agent Scott at the MCC was also violative of his sixth amendment rights. I conclude, however, that under the facts of this case no violation occurred.

At his initial post-arrest hearing, defendant was given his "rights" and knowingly waived his right to counsel. Thereafter, he was transported to the MCC for lodging. While there, Agents Scott and Tully visited, admittedly for the purpose of obtaining admissions from him. Agent Scott scrupulously administered "rights" and after defendant insisted he had no desire for an attorney, he made the inculpatory statements he now seeks to suppress.

So long as a defendant is advised of his rights and given an opportunity to obtain counsel, should he so desire, the sixth amendment does not prohibit non-coercive, pre-indictment in-custody questioning. *See, United States v. Duvall*, 537 F.2d 15 (2d Cir. 1976); *United States v. Ramirez*, 482 F.2d 807, 815–16 (2d Cir. 1973), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973), *compare United States v. Massimo*, 432 F.2d 324, 327 (2d Cir.) (Friendly, J., dissenting), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971). Indeed, even after indictment, a defendant may be questioned and his statements may be admissible, so long as the government shows that a valid waiver, *i. e.* a knowing and intelligent one, had been obtained. *United States v. Lord*, 565 F.2d 831, 839–40 (2d Cir. 1977). In this case, defendant was given ample opportunity to obtain counsel had he so desired. He does not claim to have been under a disability at the time of questioning, nor does he claim that the questioning

was coercive in nature. I find that defendant was at all times aware of his rights and that he voluntarily made the statements he now moves to suppress. Under the circumstances, that motion must be denied.

SO ORDERED.